**In re The CHARTER COMPANY, et al., Debtors.**

**PANOCEAN SOUTHLAND INCORPORATED, Plaintiff,**

v.

**CHARTER INTERNATIONAL OIL COMPANY, Defendant.**

**Bankruptcy Nos. 84–289–BK–J–GP through 84–332–BK–J–GP. Adv. No. 84–261.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Dec. 12, 1985.
As Corrected Dec. 17, 1985.

See also 52 B.R. 267, 52 B.R. 263, 50 B.R. 57, 54 B.R. 91, 49 B.R. 513, 44 B.R. 256.

Morton G. Forbes, Savannah, Ga., for plaintiff.

Russell D. Castleberry, Jacksonville, Fla., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

#### Introduction

The plaintiff, Panocean Southland Incorporated ("PSI"), commenced this adversary proceeding by filing a complaint to determine extent and validity of lien (the "Complaint") on November 9, 1984. In response to the Complaint, the debtor, Charter International Oil Company ("CIOC"), filed its amended answer, affirmative defense and counterclaim on March 29, 1985. On September 9, 1985, PSI filed its response to CIOC's counterclaim.

The trial of this adversary proceeding was held on October 3, 1985. CIOC and PSI filed a Joint Stipulation of Facts dated October 2, 1985 (the "October 2 Stipulation"), wherein the parties agreed:

(a) to the facts necessary for the Court to rule; and

(b) to the issues to be presented to the Court for determination.

At trial, the Court granted PSI's motion to reopen the evidence to allow it to introduce evidence regarding certain cleaning charges. As a result, the parties filed a stipulation on October 31, 1985, regarding the cleaning charges described in Paragraph 7 below (the "October 31 Stipulation").

The Court, having considered the October 2 Stipulation, the October 31 Stipulation and the arguments of counsel for CIOC and PSI, makes the following findings of fact and conclusions of law.

#### Findings of Fact

1. PSI is in the business of storing and allowing its customers, including CIOC, to throughput a wide variety of bulk liquids.

2. PSI and CIOC were parties to three agreements pursuant to which CIOC stored petrochemicals and petroleum products at PSI terminal facilities located in Savannah, Georgia (the "Facilities"), as follows:

(i) Contract No. 258, dated February 14, 1983;

(ii) Contract No. 247, dated September 15, 1981; and

(iii) Contract dated July 11, 1983.

The agreements described as (i)—(iii) above are referred to herein collectively as the "Agreements."

3. Defendant is to receive the escrowed sums pursuant to the Stipulation described in Paragraph 9 of the Findings of Fact and Conclusions of Law.

4. CIOC's purpose for storing of the Products and Petrochemicals (the "Inventory") from time to time at the Facilities was to provide CIOC with a central distribution point of delivery to its customers.

5. Prior to April 20, 1984 (the "Petition Date"), PSI had absolute custody and control of the Inventory, subject to direction by CIOC as to whom, and when, to deliver the Inventory.

6. CIOC was indebted to PSI on the Petition Date. The Inventory located at the Facilities continued in the custody and control of PSI until the Stipulation (as defined in paragraph 9 hereof).

7. Pursuant to the Agreements, CIOC owes PSI the sum of $48,998.47, as follows:

(i) $10,290.00 for cleaning of tanks;

(ii) $1,486.76 for wharfage fees; and

(iii) $37,221.71 for pre-petition charges ·under the Agreements.

Cleaning of the tanks was performed post-petition and was necessary and agreed to by CIOC in order to prepare those tanks for other PSI's customers use.

Neither the amount of the charges nor the amount of wharfage nor the cleaning charges are in dispute.

No other amounts are owed to PSI by CIOC in connection with the Agreements.

8. PSI claims a warehouseman's lien on the Inventory to secure payment of the foregoing charges.

9. Pursuant to a Joint Motion and Stipulation to Sell Property Free and Clear of Lien (the "Stipulation"), CIOC sold the Inventory and has escrowed sales proceeds in the amount of $62,221.71. Pursuant to the Stipulation, PSI's lien, if any, will attach to the escrowed funds to the same extent as PSI's lien, if any, existed in the Inventory on the Petition Date, up to a maximum of $48,998.47. CIOC contests the validity and extent of this alleged lien.

10. The following is a summary of a typical transaction whereby CIOC through-put Products under the Agreements:

(a) CIOC would notify PSI of its intent to make a delivery to the Facilities of Products, which only came by water borne vessel.

(b) CIOC would then deliver the Products by vessel to the Facilities.

(c) An independent inspector, hired and paid by CIOC, would monitor the delivery and issue a survey report to CIOC and PSI. (This report served the same purpose as the Inbound Transfer Report). Among other things, the survey report would set forth the time of delivery and the quantity of Products delivered. All survey reports relating to transactions under the Agreements were in the same form.

(d) At the beginning of the relationship between PSI and CIOC, CIOC delivered to PSI bank Product Receipt Tickets for the use of CIOC's consignees. PSI distributed these blank Product Receipt Tickets to third parties as directed by CIOC.

(e) CIOC would notify PSI that CIOC had authorized third parties to take deliveries by truck of certain quantities of certain grades of Products at a certain time.

(f) PSI delivery system for pre-authorized delivery of Products allows unattended, driver-operated deliveries, without the necessity of PSI personnel being present.

(g) The third parties taking delivery of the Products pursuant to CIOC's authorization and instructions to PSI would load the Products and evidence the delivery by filling out and leaving at the Facilities a Product Receipt Ticket. The Product Receipt Ticket was left at the PSI loading rack office. All Product Receipt Tickets relating to transactions under the Agreements were in the same form.

(h) To evidence the type and volume of CIOC's Products delivered to CIOC's consignees out of the Facilities, PSI would forward daily to CIOC the original of the Product Receipt Ticket. In addition, PSI would monthly complete the Terminal Inventory Report. All Terminal Inventory Reports relating to transactions under the agreements were in the same form.

11. The following is a summary of a typical transaction whereby CIOC delivered, stored and transferred Petrochemicals under the Agreements.

(a) Under normal circumstances, Petrochemicals were not received by water-borne vessels; however, if Petrochemicals had been received by water-borne vessels, then a survey would be done the same as outlined in paragraphs 10–(C) and the survey report would constitute the Inbound Transfer Report.

(b) Deliveries of CIOC's Petrochemicals were normally by rail to the Facilities and such deliveries were shown on the Inbound Transfer Report prepared by PSI. All Inbound Transfer Reports relating to the transactions under the Agreements were in the same form.

(c) Subsequently, CIOC would notify PSI that CIOC had authorized a third party to take delivery, by truck, of a certain quantity of a certain type Petrochemical at a certain time.

(d) PSI's delivery system for Petrochemicals differs from its delivery system for Products. PSI's personnel physically load-

ed CIOC's Petrochemicals for delivery to CIOC's consignee.

(e) The driver taking delivery of CIOC's Petrochemicals would present PSI with an order number authorizing the receipt thereof. PSI would compare this number with the delivery instructions of CIOC to confirm the driver's authorization to receive the Petrochemicals. Bills of lading prepared by PSI were presented to the driver for his signature. All bills of lading relating to transactions under the Agreements were in the same form.

(f) To evidence the type and volume of CIOC's Petrochemicals delivered to CIOC's consignees out of the Facility, PSI would issue to CIOC Outbound Transfer Reports. All Outbound Transfer Reports relating to transactions under the Agreements were in the same form.

(g) PSI would also issue monthly to CIOC an end-of-the-month report. All end-of-the-month reports relating to transactions under the Agreements were in the same form. The reports summarized the monthly receipts and deliveries of various Petrochemicals.

12. The Agreements required PSI to issue to CIOC the Inbound and Outbound Transfer Reports, Bills of Lading, Product Receipt Tickets and End-of-the-Month Reports.

13. PSI has never moved Inventory of CIOC out of the Facilities without first having received express delivery instructions from CIOC. Prior to Petition Date, PSI never failed to move Inventory of CIOC out of the Facilities after having received express delivery instructions from CIOC.

### Conclusions of Law

14. As set forth in the October 2 Stipulation, the dispositive issue in this case is whether PSI has a perfected warehouseman's lien on the Inventory by virtue of its "possession" of the Inventory on the Petition Date pursuant to § 11–7–209 of the Official Code of Georgia Annotated (the "OCGA").

15. The Court notes that OCGA § 11–7–209 is a part of Article 7 of the Uniform Commercial Code (the "UCC") as adopted by the State of Georgia.

16. OCGA § 11–7–209 provides, in pertinent part, that "a warehouseman has a lien against the bailor on the goods covered by a warehouse receipt ..."

17. To determine whether PSI is entitled to a warehouseman's lien, the Court must examine the definition of a "warehouse receipt" (and certain terms relevant to such definition) and determine whether a warehouse receipt must be issued as a condition to the existence of a warehouseman's lien under § 11–7–209.

18. A "warehouse receipt" is defined in OCGA § 11–1–201(45) as "a receipt issued by a person engaged in the business of storing goods for hire."

19. OCGA § 11–1–201(15) gives further meaning to the term "warehouse receipt" by defining it as a document of title which is treated as adequately evidencing that the person in possession of the warehouse receipt is entitled to receive, hold and dispose of the warehouse receipt and the goods covered by the warehouse receipt.

20. Under OCGA § 11–7–201, only a "warehouseman" may issue a warehouse receipt.

21. OCGA § 11–7–102 defines a "warehouseman" as a person engaged in the business of storing goods for hire. The Court concludes that PSI qualifies as a warehouseman under OCGA § 11–7–102.

22. Although under OCGA § 11–7–202(1), a warehouse receipt need not be in any particular form, OCGA § 11–7–202(2) provides a list of formal requirements for those warehouse receipts that are issued. *See*, Official Comment to UCC § 7–202(2).

23. Documents not meeting the requirements of § 11–7–202(2) cannot qualify as warehouse receipts. *In the Matter of A.L. Bogar Furniture Company, Inc.*, Case No. 71–H–223 (Bankr.S.D.Texas 1973); *Graves v. Garvin*, 272 F.2d 924 (4th Cir. 1959) (applying Georgia law).

24. At trial, PSI argued that the Inbound Transfer Reports and the monthly reports (both Terminal Inventory Reports and end-of-month reports) constituted warehouse receipts. The Court, however, finds that the foregoing documents did not contain the following items required by OCGA § 11–7–202(2):

(c) receipt must be consecutively numbered;

(d) receipt must contain a commitment of the warehouseman to redeliver the goods;

(e) receipt must contain the rate of storage and handling charges; and

(i) receipt must contain a statement of advances made and liabilities incurred.

In addition, certain of the documents were not "issued" by PSI to CIOC and, therefore, suffer the additional infirmity of not having been issued by a warehouseman as required by OCGA § 11–1–201(45). These documents include the Agreements, the Survey Reports, the Product Receipt Tickets and the Bills of Lading.

25. Moreover, the Court finds that neither PSI nor CIOC treated any of the documents attached to the Joint Stipulation as warehouse receipts evidencing title to the Inventory. Rather, the Court finds that these documents were merely inventory records required by the Agreements to account for the movement of the Inventory.

26. The issuance of a warehouse receipt by a warehouseman to the storer of the goods is a condition to the existence of a warehouseman's lien under OCGA § 11–7–209. The plain language of the section provides that the warehouseman's lien applies to "goods *covered by a warehouse receipt.*" (emphasis added). *See, Richwagen v. Lileenthal,* 386 So.2d 247 (Fla. 4th DCA 1980); and *Dathar Corp. v. Lemkin,* 14 U.C.C.Rept.Ser. 1207 (Sup.Ct.N.Y. 1974). In addition, Official Comment 1, interpreting UCC § 7–209, provides in pertinent part, that "a specific lien attaches automatically, without express notation on the receipt, to goods *stored under a . . . receipt.*" (emphasis added).

27. Having determined that PSI did not issue warehouse receipts covering the Inventory to CIOC, the Court must conclude that PSI is not entitled to a warehouseman's lien under OCGA § 11–7–209.

28. The Court notes in passing that pursuant to the October 2 Stipulation the parties agreed that the dispositive issue in this case was whether PSI had a *warehouseman's lien* on the Inventory. By contending that it also has a "special" lien on, and a security interest in, the Inventory, PSI has raised issues beyond the scope of the parties' agreement. However, any interest of PSI in the Inventory, whether such interest is alleged to be a warehouseman's lien, a "special" lien or a security interest, was not perfected on the Petition Date and is therefore avoidable by CIOC pursuant to § 545(2) of the Bankruptcy Code.

29. The Court will, therefore, enter a final judgment in favor of CIOC and against PSI in accordance with these findings of fact and conclusions of law.