**In re AEROSPACE TECHNOLOGIES, INC., Debtor.**

**Bankruptcy No. 95–11201C–7G.**

United States Bankruptcy Court,
M.D. North Carolina,
Greensboro Division.

May 10, 1996.

Gerald S. Schafer, Greensboro, NC, for Trustee.

J. Michael Fields, New Bern, NC, for Airway.

Richard M. Mitchell, Allan W. Singer, Charlotte, NC, for Fredrickson Motor Express Corp.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Chief Judge.

This case came before the court on April 30, 1996, for determination of the claims of Airway Moving & Storage, Inc. ("Airway") and Fredrickson Motor Express Corp. ("Fredrickson"). Each of the claimants contends that it has a secured claim as well as a cost of administration claim under § 503(b).

### JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b) which this court may hear and determine.

### MATTER BEFORE THE COURT

When this Chapter 7 case was filed, certain personal property of the Debtor, Aerospace Technologies, Inc. ("Aerospace"), was in the possession of Airway at its facility in Wilmington, North Carolina. Other personal

property of the debtor was in the possession of Fredrickson contained in two trailers located at the Fredrickson terminal in High Point, North Carolina. Each of the claimants has filed a secured claim[1] in this case in which a statutory, possessory lien is claimed by each claimant. The personal property of Aerospace remained in the possession of Airway and Fredrickson until November of 1995, when the property was surrendered to the Trustee after orders were entered in this case authorizing the Trustee to sell the personal property and transferring the liens, if any, of Airway and Fredrickson to the proceeds of such sale. Each of the claimants also contends that it has a cost of administration claim under § 503(b), based upon the claimants having stored the personal property of the estate from the time that this case was filed on May 15, 1995, until the Trustee took possession in November of 1995.

The amount claimed by Fredrickson for its pre-petition secured claim is $11,670.00, consisting of freight charges of $950.00 ($475.00 per trailer for two trailers) plus detention charges of $10,720.00 for the period from January 24, 1995 through May 14, 1995. The pre-petition detention charges claimed by Fredrickson for each of the trailers consisted of $90.00 for the first three days of detention, $120.00 for the fourth through sixth day, excluding weekends and holidays, and $50 per day thereafter through May 14, 1995. The post-petition, cost of administration claim asserted by Fredrickson is in the amount of $20,000.00 and is based upon detention or demurrage charges for the two trailers at the rate of $50.00 per day, per trailer, from May 15, 1995, the date on which this case was filed, through November of 1995 when the Trustee took possession of the personal property from Fredrickson.

The amount claimed by Airway for its pre-petition secured claim is $24,357.12, representing $14,357.12 of charges related to packing, loading and unloading of the personal

property and $10,000.00 claimed as storage for the personal property held by Airway from mid-January until May 15, 1995, the date on which this case was filed. The amount claimed by Airway for its cost of administration claim is $16,250.00, representing storage charges from May 15, 1995 through November of 1995, the date on which the Trustee took possession of the personal property which was being held by Airway. Airway has computed its storage charges at the rate of $2,500 per month for the entire period that it held the personal property of Aerospace.

## FACTS

In January of 1995, Airway was engaged in the business of moving and storage of furnishings and general commodities and had a facility located in Wilmington, North Carolina, which included a warehouse which was used to store property of customers of Airway. Fredrickson is an interstate motor carrier licensed by the Interstate Commerce Commission with a number of terminals, including a terminal in Wilmington and one in High Point, North Carolina.

Prior to January of 1995, Aerospace had certain personal property consisting of aircraft parts, office furniture, file cabinets, tools and equipment related to the testing and repair of aircraft parts, and other miscellaneous parts and equipment (the "Personal Property") stored in a building located on Gardner Drive in Wilmington, North Carolina. During the first part of January, 1995, Lee Booth, acting on behalf of Aerospace, communicated with Airway in order to obtain a quotation from Airway as to the cost of moving the Personal Property to another location.

On or about January 10, 1995, Airway submitted a written proposal to Aerospace which quoted a charge of $4,500.00 for "packing, loading, transportation to Airway premises and one month of storage based on needing

---

1. Fredrickson originally filed its claim as a priority claim. Without objections, Fredrickson was permitted to amend its proof of claim at the hearing in order to convert the claim from a priority claim to a secured claim. All parties agreed to proceed with the hearing even though the Trustee had not filed formal, written objections to proofs of claim filed by Airway and Fredrickson and Airway and Fredrickson had not filed formal applications for allowance of § 503 administrative costs. The parties thus effectively waived any procedure irregularities associated with the determination of the Airway and Fredrickson claims at the hearing on April 30, 1996.

five trailers to contain the items." The estimate from Airway specifically stated that it was "just an estimate" and that the final figures could vary "depending on the actual packing and loading and amount of trailers needed to perform all work needed." On January 10, 1995, or within a day or two thereafter, Mr. Booth, on behalf of Aerospace, signed and accepted the January 10, 1995 proposal from Airway.

At the time that the proposal was prepared, the parties were proceeding on the basis of Airway supplying the five trailers. Subsequent to the submission of the written proposal the parties decided that the trailers required to haul the personal property would be supplied by Fredrickson and that Fredrickson would transport the personal property to Greensboro in its trailers after the trailers had been loaded by Airway without the loaded trailers being stored at the Airway premises in Wilmington.

On January 16, 1995, which was the Monday following the January 10, 1995 proposal, Airway sent its employees to the building on Gardner Drive and began packing the Personal Property in containers supplied by Airway, which containers were then placed in trailers which were brought to the Gardner Drive location by Fredrickson with the exception of several very large and heavy items which were placed on two flatbed trailers supplied by a rigger selected by Airway. This work continued until some time on Saturday of that week. During the course of the week, two of the Fredrickson trailers were filled with portions of the Personal Property and were taken from the Gardner Drive location to the Fredrickson terminal located in Wilmington. These two trailers had been delivered to the Gardner Drive location earlier in the week by Fredrickson employees and after being loaded were picked up by Fredrickson employees and taken to the Fredrickson terminal. During the course of the packing and loading, certain large items owned by Aerospace were placed on the two flatbed trailers supplied by the rigging company. Because of the size and weight of these items, Airway arranged for the rigging company to perform the work involved in removing these items from the

warehouse and placing these items on the two flatbed trailers. By Saturday afternoon, the two flatbed trailers were loaded and were still located at the Gardner Drive location. In addition, most of the remaining Personal Property had been removed from the building and placed in another trailer which had been brought to the premises by Fredrickson.

On or about Friday of that week, Airway demanded that Aerospace wire transfer funds to Airway to cover the charges of packing and moving the Personal Property. No funds were wire transferred to Airway at that time. On or about Saturday of that week, demand was made by Airway that Aerospace pay Airway by other means. Aerospace did not pay the amount demanded by Airway on Saturday, at which point Airway decided to take the property still located at the Gardner Drive location from that location to Airway's facility in Wilmington, North Carolina, and to retain possession of the Personal Property until Airway had been paid by Aerospace. Airway also communicated with Fredrickson and suggested to Fredrickson that it not deliver the two trailers located at the Fredrickson terminal without getting paid first.

During the first part of the following week, Airway took the two flatbed trailers and the Fredrickson trailer containing the rest of the Personal Property to its premises in Wilmington and unloaded the Personal Property at the Airway premises. This was done without the consent or approval of Aerospace. A portion of the Personal Property was placed inside the Airway warehouse or on the dock and the remainder of the Personal Property was unloaded and placed in an area outside the building that was fenced but not covered. The area required to store the Personal Property at the Airway premises consisted of 525 square feet outside the building, 60 square feet on the dock of the building, and 676 square feet inside the building.

In the meantime, on or about January 13 or 14, 1995, Fredrickson transported the two trailers containing the remainder of the Personal Property from Wilmington to its terminal in High Point, North Carolina. Fredrickson treated the transaction as being a

cash on delivery transaction and kept the trailers at its terminal in High Point rather than delivering them to Triangle Warehouse, 201 Aero Court, Greensboro, North Carolina, pending payment of the freight charges.

On January 24, 1995, Fredrickson sent written notices to Aerospace advising that the two trailers of Personal Property were in the possession of Fredrickson and that in order to deliver the trailers Fredrickson "must have cash or certified check for freight charges . & storage charges." The notices further advised that storage charges would start on January 25, 1995, and would continue "until proper disposition is received in writing." The two notices were sent by certified mail to 5412 Guida Drive, Greensboro, North Carolina, which was the residence of Lee Booth and were delivered to the residence on January 30, 1995. Thereafter, Fredrickson sent several bills to the same address which also were received by Mr. Booth. No freight charges or storage charges were paid to Fredrickson and the Personal Property remained in the two Fredrickson trailers at the Fredrickson terminal until November of 1995, when the Trustee in this case took possession of the Personal Property. Likewise, no amounts were paid to Airway and the Personal Property located at the Airway premises remained there until November of 1995 when the Trustee took possession of that portion of the Personal Property, as well.

## ANALYSIS AND LEGAL CONCLUSIONS

I. *The Airway Claims.*

A. The pre-petition claim and whether it is a secured claim.

 The first step in determining whether Airway has a secured claim is to ascertain the lien statutes which are applicable to Airway and the transaction giving rise to the asserted possessory lien. Airway argues that the applicable statute is N.C.Gen.Stat. § 44A–2. Under this statute, any person who tows, alters, repairs, stores, services, treats or improves personal property other than a motor vehicle in the ordinary course of his business pursuant to an express or implied contract with an owner or legal possessor of the personal property has a lien upon the property. Pursuant to N.C.Gen. Stat. § 44A–3, such lien arises when the lienor acquires possession of the property and terminates and becomes unenforceable when the lienor voluntarily relinquishes the possession of the property or when an owner, his agent, a legal possessor or any other person having a security interest in the property tenders the amount secured by the lien plus reasonable storage and other expenses incurred by the lienor. Given the nature of Airway's business and the nature of the services which it was to perform on behalf of Aerospace, the court has concluded that N.C.Gen.Stat. § 44A–2 is not the controlling statute in this case. Instead, the court has concluded that N.C.Gen.Stat. § 25–7–209 is the controlling statute. Under N.C.Gen.Stat. § 25–7–209 a "warehouseman" has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including the demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. A "warehouseman" is defined in N.C.Gen.Stat. § 25–7–102(1)(h) as "a person engaged in the business of storing goods for hire." It is undisputed that Airway was engaged in the moving and storage business and that its business included storing goods for hire. Airway, therefore, easily falls within the statutory definition of a "warehouseman."

Under the January 10, 1995 written proposal from Airway which was accepted by Aerospace, Airway was to pack the Personal Property, load it into trailers and transport the Personal Property to the facility of Airway in Wilmington and store the property there. Airway was to store the goods "for hire" because the $4,500.00 price quoted by Airway included the cost of storing the property at the Airway facility for one month. This transaction was entirely consistent with the usual business of Airway which involved the moving and storage of personal property. Hence, the situation in this case is one in

which a company "engaged in the business of storing goods for hire" entered into a transaction which initially contemplated that company engaging in just that type business. As such, the controlling statute should be G.S. § 25–7–209, the statute specifically addressed to that type of business, rather than § 44A–2, a statute of general application applicable primarily to artisans. *See Tate v. Action Moving and Storage, Inc.*, 95 N.C.App. 541, 545, 383 S.E.2d 229 (1989) (any right which the plaintiff had against a defendant involved in the moving and storage business "is properly analyzed as a warehouseman's lien under Article Seven of the U.C.C." rather than Chapter 44A); *Grundey v. Clark Transfer Co., Inc.*, 42 N.C.App. 308, 256 S.E.2d 732 (1979); *Suddath Moving and Storage Co. v. Roure*, 276 So.2d 549 (Fla.App. 1973) (a moving and storage company which was requested by the plaintiff to pick up contents of his house and store them pending notification of an address to which they would be shipped was a "warehouseman" within the meaning of § 7–209 of the Uniform Commercial Code).

■ N.C.Gen.Stat. § 25–7–209 grants a lien to a warehouseman "on the goods covered by a warehouse receipt or on the proceeds thereof in his possession. . . ." Under this language, the issuance of a warehouse receipt by a warehouseman to the storer of the goods is a condition precedent to the existence of a warehouseman's lien. Even if the warehouseman has possession of the goods, no lien is acquired under § 7–209 of the Uniform Commercial Code in the absence of a warehouse receipt having been issued for the goods. *In re Charter Co.*, 56 B.R. 91, 95 (Bankr.M.D.Fla.1985). *In accord In re Knoware, Inc.*, 57 B.R. 163, 165 (Bankr. D.Mass.1986) ("The warehouseman's lien is expressly dependent upon the issuance of such a document."); *In re Celotex Corp.*, 134 B.R. 993, 996 (Bankr.M.D.Fla.1991) ("Once qualified as a warehouseman, in order to acquire a lien the warehouseman must issue a document known as a warehouse receipt. The receipt is a condition precedent to establishing a lien on the goods in the possession of the warehouseman."); *In re Siena Publishers Associates*, 149 B.R. 359, 362 (Bankr. S.D.N.Y.1993) ("A warehouse lien is statutory and pursuant to New York UCC § 7–209(1), it is only available upon goods for which a warehouse receipt has been issued.").

■ Under § 7–202 of the Uniform Commercial Code which has been adopted in North Carolina as G.S. § 25–7–202, a warehouse receipt need not be in any particular form. However, there are certain terms which must be included in order for a document to constitute a warehouse receipt. Included among these terms are the location of the warehouse where the goods are stored, the date of issue of the receipt, the consecutive number of the receipt, a statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order, the rate of storage and handling charges, a description of the goods or of the package containing the goods, the signature of the warehouseman, and certain other information which is specified in § 7–202 of the Uniform Commercial Code. An invoice or bill from the warehouseman which simply itemizes the charges of the warehouseman and states the total amount due does not qualify as a warehouse receipt. *See In re Celotex Corp.*, 134 B.R. 993 (Bankr.M.D.Fla.1991). In the present case, there was no evidence that a warehouse receipt was ever issued by Airway. Although the evidence included an Airway invoice dated April 24, 1995, addressed to Aerospace, this invoice contains few of the terms specified in G.S. § 25–7–202. For example, the invoice does not include a description of the Personal Property nor state whether the goods will be delivered to bearer or to a specific person. The invoice therefore falls short of qualifying as a warehouse receipt.

Moreover, the evidence concerning the circumstances under which Airway acquired possession of the Personal Property strongly suggests that no warehouse receipt was issued. Under the January 10, 1995 proposal, Airway was to pack the Personal Property, load it into trailers and transport the personal property to the facility of Airway and store the property there until further notice from Aerospace regarding the ultimate destination of the Personal Property. However, before

the work was completed, and perhaps before the work even began, Airway and Aerospace modified the arrangement by verbally agreeing that the necessary trailers would be provided by Fredrickson who was to then handle the transportation of the Personal Property from Wilmington to Greensboro. Under the modified arrangement, the loaded trailers were to be taken to the Fredrickson terminal in Wilmington rather than being stored at the Airway facility after they were loaded. Pursuant to this arrangement, the first two trailers that were loaded, in fact, were taken to the Fredrickson terminal. However, after the remaining Personal Property had been loaded into three additional trailers and Airway was finished or nearly finished with the packing and loading of the Personal Property, a dispute arose between Airway and Aerospace regarding the amount to be paid to Airway for its services. At that point, all of the Personal Property, except for the property contained in the two trailers which had been taken to Fredrickson, was still located at the Aerospace location on Gardner Drive. Further, at that point, the arrangement between Airway and Aerospace did not call for Airway to store the property at its premises. The reason that the Personal Property was removed from the location on Gardner Drive by Airway, therefore, was not to carry out the terms of the agreement or consensual arrangement between Airway and Aerospace. Instead, Airway acted unilaterally and without the consent of Aerospace in removing the property from the Gardner Drive location and taking it to the Airway premises. Airway thereafter "stored" the property to gain leverage in forcing payment of the disputed amount which it claimed was due. This, too, was done without the consent or approval of Aerospace. These are not the type of circumstances under which a warehouse receipt would likely be issued.

▮ Furthermore, the circumstances present in this case would not give rise to a possessory lien under N.C.Gen.Stat. § 44A–2 even if that statute were applicable in this case. At the time that Airway took possession of the Personal Property, the only agreement which it had was one under which it was to pack and load items of personal property onto trailers. The packing of personal property into boxes and loading those boxes onto a trailer owned by another company is not a type of work which is encompassed by G.S. § 44A–2. In short, an entity whose work is limited to merely packing and loading a truck does not "repair", "service", "treat" or "improve" personal property within the meaning of G.S. § 44A–2. Furthermore, although G.S. § 44A–2 encompasses one who "stores" personal property, one who takes possession of personal property without the agreement or consent of the owner or an agent of the owner does not "store" that personal property for purposes of G.S. § 44A–2 which requires that the lienor act pursuant to an express or implied contract with the owner.

In summary, the lien statute applicable to Airway is G.S. § 25–7–209. Under G.S. § 25–7–209 the warehouseman must issue a warehouse receipt covering the goods upon which the lien is claimed. The evidence failed to show that any warehouse receipt was ever issued by Airway with respect to the Personal Property owned by Aerospace. Moreover, the fact that Airway gained possession of the Personal Property without any agreement to do so and without the approval or consent of Aerospace is an additional reason why Airway may not acquire a lien against the Personal Property under either G.S. § 25–7–209 or G.S. § 44A–2. Possessory liens are "fundamentally consensual in nature and arise from some agreement, either express or implied, between the owner of goods and his bailee who renders some service with respect to those goods." *See Younger v. Plunkett*, 395 F.Supp. 702, 707 (E.D.Pa.1975). There was nothing consensual about the manner in which Airway "stored" Aerospace's Personal Property. The pre-petition claim of Airway, therefore, is a general unsecured claim.

▮ The remaining issue regarding the pre-petition claim of Airway is the amount of the unsecured claim. In that regard, Airway is not limited to the $4,500.00 figure referred to in the January 10, 1995 proposal. The proposal makes it clear that the $4,500.00 figure was only an estimate and that the actual charge could vary depending

upon the work actually required in order to perform the job. The result is that while there was an agreement between Airway and Aerospace, the agreement failed to specify the amount which was to be paid to Airway. Where there is a contract between parties under which one party agrees to pay compensation for services, but the contract fails to specify the amount to be paid for the services, the party furnishing the services thereunder may recover the reasonable value of the services. *See Beasley v. McLamb*, 247 N.C. 179, 100 S.E.2d 387 (1957); *Thormer v. Lexington Mail Order Co.*, 241 N.C. 249, 85 S.E.2d 140 (1954); *Duffell v. Weeks*, 15 N.C.App. 569, 190 S.E.2d 379 (1972); 17A Am.Jur.2d *Contracts* § 501 (1991).

Since the agreement between Airway and Aerospace contained only an estimate of what the charges would be, and did not contain any formula or method for computing the charges with certainty, the correct amount of the Airway claim is the reasonable value of the services supplied by Airway in performing the agreement, including the reasonable amount of any extraordinary expenses necessarily incurred by Airway in performing the work specified in the agreement. Under the agreement, as modified by the parties after the written proposal was submitted, Airway was to pack and load the Personal Property onto trailers supplied by a third party. Airway performed its agreement and in doing so supplied certain cartons and labor in order to pack and load the Personal Property. Because of the extraordinary size and weight of some of the items, it was necessary for Airway to utilize the services of a rigging company and also to rent a special forklift with the capacity to handle the size and weight of the items in question. Because of the lack of lighting at the Gardner Drive location, it also was necessary for Airway to rent a generator and certain lighting equipment. Additionally, Airway incurred necessary and reasonable expenses in hauling a portion of the Personal Property to Greensboro at the request of Aerospace. The court finds and concludes that Airway is entitled to recover for all of these items and that the reasonable value of these services and expenses is $9,606.72, consisting of the following items:

| | |
|---|---|
| Packing Dish Packs | $ 1,121.25 |
| Packing 1.5 Cartons | 2,338.25 |
| Packing 3.0 Cartons | 1,124.70 |
| Packing 4.5 Cartons | 1,708.05 |
| Packing Mirror Cartons | 35.80 |
| Packing 6.0 Cartons | 21.60 |
| Less 20% on Packing | −1,069.93 |
| Line Haul for Truck to Greensboro | 475.00 |
| Expense paid to rigging company | 3,272.00 |
| Generator & light rental | 100.00 |
| Helper to unload truck in Greensboro | 90.00 |
| Driver to unload truck in Greensboro | 90.00 |
| Forklift rental | 300.00 |
| **TOTAL:** | **$ 9,606.72** |

The other items claimed by Airway should be disallowed. The disallowed items include the labor cost of $3,875.00 which Airway incurred in order to unload the three trailers after the three trailers were moved by Airway from the Gardner Drive location to Airway's warehouse. Also disallowed is an expense item of $100.00 incurred for relocating the trucks to the Airway facility and $757.12 paid to Fredrickson in connection with the three trailers being moved to the Airway location by Fredrickson. Finally, the court has disallowed any storage charges for the period from January 23, 1995, when the trailers were taken to the Airway location, until this case was filed on May 15, 1995. All of these charges are the direct result of Airway having taken possession of the Personal Property without any authorization to do so and having retained the Personal Property without the permission or consent of Aerospace. In taking possession of the Personal Property, Airway acted outside of any agreement which it had with Aerospace and without the approval or consent of Aerospace and prevented Aerospace from taking the property to its storage area in Greensboro. Airway, therefore, is not entitled to be compensated for the expenses incurred in doing so.

B. The cost of administration claim.

Under § 503 of the Bankruptcy Code, the "actual, necessary costs and expenses of preserving the estate" are allowable as administrative expenses. It is well established that providing storage for prop-

erty of the estate constitutes "preserving the estate" within the meaning of § 503(b)(1)(A) and that post-petition storage costs therefore may be granted administrative expense priority. *See In re Great Northern Forest Products, Inc.,* 135 B.R. 46, 59 (Bankr. W.D.Mich.1991). The critical factors are whether the premises were utilized by the Trustee for storage and whether the estate thereby was benefitted. There is no requirement that there be an express agreement between the Trustee and the owner of the property:

> Although the controverted evidence submitted at trial did not meet the quantum of proof necessary to establish the existence of a rental agreement, the Trustee's use of the warehouse as storage space was necessary and preserved the assets of the estate until such assets were eventually sold at auction. For such valuable services, an allowance for rent is equitable under the circumstances to the extent of the actual amount of space used as storage.

*In re Grimm & Rothwell, Inc.,* 108 B.R. 186, 190 (Bankr.S.D.Ohio 1989). The amount of a cost of administration claim arising from the use of premises to store property of the estate is the benefit accruing to the estate for the use of the premises. In such a circumstance, the measure of the benefit to the estate is the reasonable rental value of the premises which were occupied and used by the Trustee. While the court has discretion to fix the reasonable administrative rent, the contract rent is presumptively the reasonable value for such use and occupancy. Obviously, such a presumption may be rebutted by the Trustee demonstrating that the reasonable worth or value of the lease is different from the contract rate. *See In re Williams Contract Furniture, Inc.,* 148 B.R. 799, 804 (Bankr.E.D.Va.1992); *In re K–Fabricators, Inc.,* 135 B.R. 654 (Bankr.W.D.Wash.1992); *In re Vetzel Moving & Storage, Inc.,* 84 B.R. 786 (Bankr.M.D.Fla.1988).

During the pendency of this case and prior to the time that the Trustee could sell the Personal Property, it was necessary that the property be stored and preserved in an appropriate storage facility. The property of the estate in this case did not include a building or other location in which the property could be stored. Had the property not been stored at the Airway facility, the Trustee would have been required to store it some place else and to pay rent or storage charges for doing so. Consequently, in providing storage for the Personal Property from the time that this case was filed until the Trustee took possession in November of 1995, Airway preserved property of the estate and, therefore, has a valid cost of administration claim under § 503(b)(1)(A).

As to the amount of the Airway cost of administration claim, there was no lease or rental agreement with Airway regarding the space which was utilized for the storage of the Personal Property. Therefore, in this case, there is no rental rate which is presumptively reasonable. While the Personal Property was stored at the Airway facility it occupied 676 square feet inside the Airway warehouse, 60 square feet on the dock of the building and 525 square feet outside the building. Airway offered evidence that the fair rental or storage value for all of this space was $1.98 per square foot for a total monthly charge of $2,500.00. Although it seems odd that the cost would be the same for exposed space located outside the building as for protected space inside the building, the Trustee offered no evidence contradicting or disputing the evidence of Airway as to the fair market value of the space occupied by the Personal Property. In the absence of any evidence to the contrary, the court finds and concludes that the reasonable value of the storage space occupied by the property at all times pertinent to this matter was $2,500.00 per month. Therefore, the court finds and concludes that Airway should be allowed a cost of administration claim pursuant to § 503(b)(1)(A) in the amount of $16,250.00 consisting of six and one-half months of storage charges at the rate of $2,500.00 per month.

## II. *The Fredrickson Claims.*

### A. The pre-petition claim and whether it is a secured claim.

Fredrickson asserts a possessory lien based upon N.C.Gen.Stat. § 25–7–307 which is entitled "Lien of carrier." Fre-

drickson is a licensed motor carrier and was functioning as such in transporting the Personal Property from Wilmington to High Point. Fredrickson, therefore, is a "carrier" for purposes of G.S. § 25–7–307 and is entitled to invoke the lien rights granted under G.S. § 25–7–307.

Under the provisions of G.S. § 25–7–307 a carrier has a lien "on the goods covered by a bill of lading" for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law. The lien which is available under G.S. § 25–7–307 is limited to goods which are covered by a bill of lading. Under this statutory provision which comes from the Uniform Commercial Code, there is no lien in favor of the carrier in the absence of a bill of lading covering the goods in question. *See In re Celotex Corp.*, 134 B.R. 993, 998 (Bankr.M.D.Fla.1985) ("As to any carrier's lien claimed by Northern Indiana, there is no bill of lading issued by Northern Indiana which would establish such a lien."); *In re Pester Refining Co.*, 66 B.R. 801, 814 (Bankr.S.D.Iowa 1986) ("There is no evidence that the product being held by Mid–America is covered by a bill of lading, and thus subject to a carrier's lien."), *aff'd*, 85 B.R. 520 (S.D.Iowa 1987), *aff'd in part, and rev'd in part not relevant here*, 845 F.2d 1476 (8th Cir.1988); *Darby v. Baltimore and Ohio R. Co.*, 259 Md. 493, 270 A.2d 652 (1970). In the present case, therefore, the validity of the lien asserted by Fredrickson is dependent upon the Personal Property in its possession having been shipped under a bill of lading.

Pursuant to Rule 3001(c) of the Federal Rules of Bankruptcy Procedure, when a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate of such writing "shall be filed with the proof of claim." If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction "shall be filed with the claim." Under Rule 3001(d) of the Federal Rules of Bankruptcy Procedure, if a security interest in property of the debtor is claimed, "the proof of claim shall be accompanied by evidence that the security interest has been perfected." Under subsection (f) of Bankruptcy Rule 3001 a proof of claim "executed and filed in accordance with these rules" constitutes *prima facia* evidence of the validity and amount of the claim.

The proof of claim filed by Fredrickson in the present case has attached to it only a letter which Fredrickson wrote in October of 1995. It does not have the freight bills attached nor does it have any bills of lading or other evidence of a perfected lien or security interest attached thereto. The proof of claim, therefore, does not constitute *prima facia* evidence that Fredrickson has a perfected and valid lien against any property of the estate in this case. At the hearing the burden of proof was upon Fredrickson to establish by the greater weight of the evidence that it has a valid, duly perfected possessory lien. In order to do so, it was incumbent upon Fredrickson to show by the greater weight of the evidence that the Personal Property which was held by Fredrickson until November of 1995 was covered by a bill of lading issued by Fredrickson. Fredrickson did not do so. The evidence adduced at the hearing failed to show by the greater weight of the evidence that the goods in question were shipped under a bill of lading. There was some testimony by a Fredrickson employee concerning the issuance of one or more bills of lading by Fredrickson. However, no bills of lading were produced by Fredrickson at the hearing. In the absence of any bills of lading being produced by Fredrickson and absent any explanation as to why bills of lading were not produced and offered into evidence, the unsupported testimony regarding the issuance of bills of lading, in the context of the evidence as a whole, lacks sufficient credibility and weight for the court to find that the goods, in fact, were shipped under bills of lading. Since Fredrickson failed to satisfy the court by a preponderance of the evidence that bills of lading were issued by Fredrickson and that the goods in question were shipped under such bills of lading, Fredrickson has failed to show that it acquired a lien under the provisions of G.S. § 25–7–307. The court therefore concludes that the pre-petition claim of Fre-

drickson is a general unsecured claim in this case.

 This leaves the issue of the amount of the Fredrickson unsecured claim. According to the evidence of Fredrickson, the shipment of the Aerospace property from Wilmington to Greensboro was a cash on delivery shipment. Consistent with such a delivery, a notice was sent to Aerospace on January 24, 1995, advising that payment by cash or certified check was required before delivery could be made and that storage charges would commence on January 25, 1995. This evidence was not disputed by the Trustee, although it was disputed as to whether the notice was received by Mr. Booth on behalf of Aerospace. This dispute has been resolved in favor of Fredrickson, the court finding that the notice was received by Mr. Booth who admitted receiving later letters advising that the trailers were awaiting delivery by Fredrickson. The amount of the freight charge was $475.00 per trailer which was not disputed by Aerospace. Nevertheless, Aerospace failed to pay the freight charge or arrange for the trailers to be delivered and the two trailers containing the Personal Property were still at the Fredrickson terminal in High Point when this case was filed on May 15, 1995. Under these circumstance the court concludes that Fredrickson has a valid claim for the freight charges of $950.00 plus demurrage on the trailers from January 25, 1995, through May 14, 1995. The amount of the demurrage is determined by the I.C.C. tariff which was relied upon by Fredrickson and offered into evidence. Under the tariff Fredrickson is entitled to demurrage of $10,720.00 for both trailers, for a total unsecured pre-petition claim of $11,670.00.

### B. The Fredrickson cost of administration claim.

 Fredrickson has a cost of administration claim under § 503 for the same reasons that Airway has such a claim. Thus, the storage of the Personal Property in the Fredrickson trailers benefitted the estate in the same manner as did the storage of the rest of the Personal Property at the Airway warehouse in Wilmington. Under the I.C.C.

tariff Fredrickson is entitled to $50.00 per day per trailer from May 15, 1995 through November of 1995 for a total cost of administration claim of $20,000.00.

An order will be entered forthwith in accordance with this memorandum opinion.