In re PATIENT EDUCATION
MEDIA, INC., Debtor.

Bankruptcy No. 97 B 41654(SMB).

United States District Court,
S.D. New York.

June 8, 1998.

Warshaw, Burstein, Cohen, Schlesinger & Kuh, LLP, New York City, Donald L. Kuba, of counsel, for Official Committee of Unsecured Creditors.

Robinson & Cole, Hartford, CT, Michael R. Enright, of counsel, for Sonalysts, Inc.

## MEMORANDUM DECISION REGARDING ADMINISTRATIVE CLAIM OF SONALYSTS, INC.

STUART M. BERNSTEIN, Bankruptcy Judge.

Prior to bankruptcy, Patient Education Media, Inc. ("PEMI" or the "debtor") stored its video production set on the premises of Sonalysts, Inc. The parties had agreed that the debtor would pay Sonalysts a weekly storage fee of $5,500.00. Postpetition, Sonalysts continued to store the set for approximately twenty six weeks, and now seeks payment of postpetition storage fees, aggregating $138,000.00, as an administrative expense. The debtor and the Official Committee of Unsecured Creditors oppose the application. They argue that since the estate eventually abandoned its interest in the set to Sonalysts,[1] the storage services did not benefit the estate.

The matter was tried before me on April 7, 1998. Three witnesses testified, and numerous documents were received in evidence. Based upon the undisputed facts set forth in the Joint Pre–Trial Order, dated February 17, 1998 ("JPTO"), and the record made at the evidentiary hearing, I conclude that Sonalysts is entitled to payment of an administrative claim in the amount of $65,214.29.

## BACKGROUND

At all relevant times, the debtor produced and distributed educational video tapes and other materials related to health care. On January 6, 1995, the debtor and Sonalysts entered into a Production Agreement. (Plaintiff's Trial Exhibit ("PX") 1.) The debtor agreed to produce approximately seventy-five video tapes, and Sonalysts agreed to provide the necessary production services. (JPTO ¶ 5.4.)

Reid & Priest LLP, New York City, Marc E. Richards, of counsel, for debtor.

---

1. Technically, PEMI sold the set to Sonalysts. In truth, the sale was an abandonment.

The debtor required a customized production set. Lincoln Scenic, Inc. built a circular set, twenty four feet high and sixty feet in diameter, at an approximate cost of $365,-000.00, and the set was housed on a sound stage at Sonalysts' headquarters. (*Id.* at ¶ 5.4.) The sound stage measured 7,000 square feet with forty foot ceilings, and the set occupied virtually the entire area. (*Id.* at ¶ 5.4.)

The set remained in place on the sound stage when the debtor was not making videos. The debtor had considered dismantling and storing the set elsewhere during production down time. It decided against it because of the cost and delay in restarting production. (Transcript of hearing, held Apr. 7, 1998 ("Tr."), at 61, 63, 83.) In addition, it wanted to use the set to impress potential investors. (*Id.* at 62.) The parties orally agreed that the debtor would pay a reduced storage fee of $5,500.00 for each week that the set was not in use, *i.e.*, between production shoots. Sonalysts billed this sum and the debtor paid it regularly until shortly before the institution of this chapter 11 case. (JPTO ¶ 5.5.)

At it turns out, the debtor produced only thirty four video tapes, and all production ended in September 1996. (*Id.* at ¶ 5.6.) The debtor ceased all operations on December 20, 1996, (*id.*), and after then, it proceeded to liquidate its assets. By the time the debtor filed its chapter 11 petition on March 14, 1997, the estate's assets consisted primarily of its intellectual property and the set.

After this case was commenced, the debtor continued its efforts to sell its remaining assets, and eventually entered into a sale agreement with Glaxo Wellcome, Inc. ("Glaxo"). Fairly soon, however, the set assumed the mien of the proverbial 800 pound gorilla with whom no one dared to dance. Glaxo wavered on taking it. In the meantime, Sonalysts repeatedly demanded that the debtor pay administrative use and occupancy at the weekly rate of $5,500.00 while the set sat on Sonalysts' sound stage, and urged the debtor to abandon it immediately. (*See* PX 4, 5, 7; JPTO ¶ 5.7) The debtor did neither, viewed Sonalysts' storage charges as

exorbitant, and responded with the ultimate threat: if Sonalysts did not relent, the debtor would abandon the set to Sonalysts:

> [S]hould Sonalysts pursue this position, we will seek to have Glaxo Wellcome amend the Agreement and exclude the Set, and then abandon the Set to Sonalysts. So much for the Set claim.

(PX 6.)

The return date for the motion to approve the Glaxo transaction was June 5, 1997. As the quoted portion of plaintiff's exhibit 6 states, Glaxo originally intended to purchase the set. (*See also* JPTO ¶ 5.9.) By the return date, however, Glaxo had changed its mind. In addition, Sonalysts had objected to the sale, primarily because it involved the transfer of intellectual property rights that it claimed it owned. (*Id.* at ¶ 5.11.) In order to resolve Sonalysts' objection, the debtor offered, *inter alia*, to transfer the set to Sonalysts. (*Id.*) At some point, Sonalysts accepted.[2]

The settlement and transfer of the set were contingent on the closing of the Glaxo transaction. Because of various objections, the Court did not enter an order approving the sale to Glaxo until August 13, 1997. Two days later, Sonalysts wrote to the debtor asking if it could now dispose of the set and minimize the administrative claim. (PX 8.) The debtor did not respond. (JPTO ¶ 5.12.) The debtor transferred title to Sonalysts when the Glaxo deal closed on September 16, 1997. (*Id.* at ¶ 5.13.) Sonalysts never used the set. Instead, it dismantled and donated it to the Norwich Communication, Technology and Learning Center in Norwich, Connecticut as a charitable contribution. (JPTO ¶ 5.14.)

## DISCUSSION

### A. Introduction

■ The resolution of the dispute before me turns on whether and to what extent the use of Sonalysts' sound stage benefitted the estate. Section 503(b)(1)(A) of the Bankruptcy Code grants administrative expense status to the "actual, necessary costs and expenses

---

**2.** Although not part of the settlement, the debtor subsequently rejected the Production Agreement.

of preserving the estate." [3] The priority furthers the goal of rehabilitation by encouraging third parties to supply goods and services on credit to the estate. *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1134 (10th Cir. 1993); *In re Dant & Russell, Inc.*, 853 F.2d 700, 707 (9th Cir.1988); *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 161 (6th Cir.1988); *cf. In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976) (discussing § 64a(1) of the former bankruptcy act). Because the priority elevates the payment of the administrative claim to the detriment of the unsecured creditors, *see* 11 U.S.C. § 507(a)(1), the language of section 503(b)(1)(A) must be narrowly construed to promote the bankruptcy goal of equality of distribution. *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100–01 (2d Cir.1986); *In re Dant & Russell, Inc.*, 853 F.2d at 706; *In re Templeton,* 154 B.R. 930, 934 (Bankr.W.D.Tex.1993); *In re CIS Corp.*, 142 B.R. 640, 642 (S.D.N.Y.1992); *cf. In re Mammoth Mart, Inc.*, 536 F.2d at 953–54 (discussing § 64a(1) of the former bankruptcy act).

 The party asserting the status of an administrative claimant has the burden of proof. *In re Mid Region Petroleum, Inc.*, 1 F.3d at 1132; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y.1991). He must demonstrate that (1) his claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and (2) the transaction or consideration directly benefitted the debtor-in-possession. *In re Mid Region Petroleum, Inc.*, 1 F.3d at 1133; *In re United Trucking Serv., Inc.*, 851 F.2d at 161–62 (quoting *In re Mammoth Mart, Inc.*, 536

F.2d at 954); *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d at 101; *In re CIS Corp.*, 142 B.R. at 643. Consideration exists generally where (1) the debtor-in-possession induces the creditor to perform postpetition, or (2) the creditor performs under an executory contract prior to rejection. *Id.* at 643; *see In re United Trucking Serv., Inc.*, 851 F.2d at 161 (where the claim arises from the postpetition use of property pursuant to a prepetition lease, the "inducement" test does not apply, and the claim is based upon unjust enrichment) (quoting *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124, 126 (2d Cir.1960)).

## B. Benefit to the Estate

 Executory contracts and unexpired leases (collectively, "executory contracts") pose special problems. The parties may continue to perform prior to assumption or rejection,[4] or even without any conscious attempt to perform, the debtor in possession may simply find himself in possession and control of the nondebtor's property. "If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).

 In practice, this test is not always easy to apply. The decision to assume or reject the executory contract usually takes time to make. Courts must carefully scrutinize the circumstances to insure that the estate is not being charged, on a priority basis, simply for the delay in making the

3. Section 503(b)(1)(A) states:
 After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
 (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

4. Much has been written about the parties' respective obligations to perform an executory contract prior to assumption or rejection. Generally, the debtor in possession is not required to

perform prior to assumption, *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984), but the nondebtor party is. *See, e.g., Public Serv. Co. v. New Hampshire Elec. Coop. (In re Public Serv. Co. of New Hampshire),* 884 F.2d 11, 14–15 (1st Cir.1989); *Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.),* 715 F.2d 375, 378 (7th Cir.1983); *McLean Indus., Inc. v. Medical Lab. Automation, Inc. (In re McLean Indus., Inc.),* 96 B.R. 440, 448 (Bankr. S.D.N.Y.1989).

decision.[5] Rather, the court must focus on whether the debtor *used* the nondebtor's property in the ordinary course of its business, and continued to receive and accept the nondebtor's performance under the executory contract.

The "benefit" test is an objective one. If a debtor in possession actually uses leased property prior to rejection, the lessor may recover the unpaid rent, or the reasonable value. of the debtor in possession's use and occupancy, as an administrative expense. *In re Thompson*, 788 F.2d 560, 562 (9th Cir.1986); *In re Aerospace Technologies, Inc.*, 199 B.R. 331, 339–40 (Bankr.M.D.N.C. 1996) (cost of storing property of the estate is an administrative expense). If the debtor in possession uses only part of the leased property, he must pay an administrative expense only for the part he uses. *In re Thompson*, 788 F.2d at 562; *Broadcast Corp. v. Broadfoot*, 54 B.R. 606, 611–13 (N.D.Ga. 1985) (estate liable only for the seventeen days it actually used creditor's broadcast signal during the sixty day prerejection period), *aff'd*, 789 F.2d 1530 (11th Cir.1986); *cf. In re United Cigar Stores Co.*, 69 F.2d 513, 515 (2d Cir.) (trustee liable only for the use and occupation of the portion of the leased premises that the estate physically occupied) (decided under the former bankruptcy act), *cert. denied*, 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934).

If, however, the debtor in possession does not use the property, the nondebtor is relegated to an unsecured claim. Even where the debtor in possession possesses the nondebtor's property, or has the option to use, no administrative expense liability will attach unless he actually uses it. *In re Mid Region Petroleum, Inc.*, 1 F.3d at 1133 (railcar lessor not entitled to administrative expense where debtor in possession

possessed but did not use railcars during prerejection period); *Broadcast Corp. v. Broadfoot*, 54 B.R. at 611; *In re R.H. Macy & Co.*, 170 B.R. 69, 78 (Bankr.S.D.N.Y.1994) (landlord not entitled to administrative claim for postpetition rent accruing on unoccupied leasehold that the debtor sought unsuccessfully to assign); *In re Templeton*, 154 B.R. at 933 ("[a]ctual use, not mere possession, is a prerequisite to establishing an administrative priority claim"); *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 37–38 (Bankr.N.D.N.Y. 1989) (computer lessor not entitled to administrative claim where debtor in possession stored but did not use the leased equipment); *cf. American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d at 126 (debtor in possession who chartered but did not use third party's vessels not liable for administrative expense under § 64a(1) of the former bankruptcy act); *but cf. In re United Trucking Serv., Inc.*, 851 F.2d at 162 (failure by debtor in possession to maintain lessor's equipment in its possession, as required under the party's lease, gave rise to a damage claim allowable as an administrative expense); *contra In re Fred Sanders Co.*, 22 B.R. 902, 906 (Bankr.E.D.Mich.1982). Tying the administrative claim to actual use, as opposed to mere possession, permits the debtor in possession to make a reasoned decision between assumption and rejection without exposing the estate to administrative liability solely on account of the delay. *See American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d at 126.

The evidence at trial amply supports a finding that PEMI knowingly and willingly used Sonalysts' property during the prerejection period to preserve and maximize the assets of the estate.[6] It continued to store its set on Sonalysts' premises—and hence,

---

5. This concern is not present if the debtor in possession eventually assumes the contract because he must cure any defaults as a condition to assumption. *See* 11 U.S.C. § 365(b)(1)(A).

Rejection, on the other hand, leaves the nondebtor or party to the contract with an unsecured claim, *see* 11 U.S.C. §§ 365(g)(1), 502(g), except to the extent the nondebtor can establish an administrative claim under Section 503(b)(1)(A). The issue presented by this and similar cases focuses

on the prerejection period. Section 365(d)(3), which resolves this issue in the case of nonresidential real property leases, does not apply to the instant case.

6. Since December 1996, the only business that the debtor conducted was the liquidation of its assets. In this sense, liquidation was its ordinary and only business.

Sonalysts continued to render performance—using the entire sound stage for that purpose. The debtor thought that preservation of the set was necessary to the liquidation process, believing that it gave the company stature and maximized the possibility of a sale of its assets to another video producer. (Tr. 101, 122–23.) PEMI did nothing to discourage Sonalysts' performance, and ignored its ultimately sound advice to abandon the asset and save the administrative cost, even after it became aware that the storage costs exceeded its value. (*See* PX 6.)

This would seem to entitle Sonalysts to an administrative claim. PEMI, however, proposes a "heads I win, tails you lose" test for determining the extent of Sonalysts' claim under section 503(b)(1)(A). It argues that the use of the sound stage did not benefit the estate because the estate did not sell the set, and its preservation did not, therefore, enhance the value of the estate. By this, PEMI equates benefit with profit, making Sonalysts a junior partner whose right to administrative payment rests on PEMI's business acumen and luck. The cases that PEMI cites in support of this proposition turn on the distinction between use and possession, not use and profit, and hence, do not support its position. As Sonalysts correctly notes, the debtor in possession did not simply possess the right to use the sound stage, it actually used it.

■■■■ Moreover, profit is not the test of "benefit" under Section 503(b)(1)(A). *See In re Continental Airlines, Inc.*, 146 B.R. 520, 527 (Bankr.D.Del.1992) (the creditor must show that the debtor in possession used his property in the ordinary course of his business, and not that he put the property to its highest and best use). Just as the debtor in possession must still pay a trade vendor who provides inventory that cannot be sold, the debtor in possession must pay for the use of a nondebtor's property, even where the use turns out to be unprofitable. *Cf. In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 26 (2d Cir. 1996) (a lessor under an assumed lease does not lose its priority the moment the deal turns sour and the assumed lease becomes unprofitable). Linking the creditor's priority entitlement to the profitable use of his credit will chill the creditor's willingness to extend credit, and ultimately, frustrate the goal of rehabilitation.

■■■■ The rationale of this conclusion does not, however, extend beyond June 5, 1997. On or about that date, the parties seem to have reached an agreement in principle. The debtor agreed to surrender the set to Sonalysts as part of an overall settlement involving disputes over intellectual property. The parties consummated their settlement on September 16, 1997, at the time the Glaxo transaction closed. Nevertheless, once they reached their agreement in principle, the set was stored to preserve the asset for the benefit of Sonalysts rather than the estate.[7] *See In re Mainstream Access, Inc.*, 134 B.R. 743, 750 (Bankr.S.D.N.Y.1991) (no administrative claim where debtor abandoned property on landlord's premises to landlord who thereby received the benefit of any value preserved by the use of its property).[8] After

---

7. Sonalysts argues that the debtor should pay administrative use and occupancy through September 16, 1997, because it continued until then to preserve the set for possible sale should the Glaxo deal fall through. In this regard, surrender of the set was made contingent on the Glaxo closing, and PEMI did not reply to Sonalysts' request for permission to remove the set after June 5, 1997 but prior to closing.

Sonalysts failed to prove its theory of delay at trial. It did not offer proof to explain why the Sonalysts settlement and the Glaxo closing were linked; the intellectual property issues—not the set—were Sonalysts' main concern, (*Tr.* at 87), and there may have been sound reasons why the settlement had to await the Glaxo closing. Sonalysts did not show that the debtor affirmatively considered *its* request to remove the set (which it did not make until mid-August, 1997). Finally, it did not adduce evidence that PEMI purposely ignored its request for the ulterior motive that Sonalysts suggests. Sonalysts could have called its own personnel or PEMI's attorneys and officers as trial witnesses to flesh out its theory, but never did. Thus, we are left to speculate. Given the purpose of administrative expenses and the effect that their allowance has on the general creditors, I am not inclined to do so.

8. PEMI relied on *Mainstream* during prior proceedings to support the more general proposition that where the landlord receives the property, the landlord's claim for storing the property cannot be an administrative claim chargeable against the estate. It has not cited *Mainstream* in its posttrial memorandum, and the case does

the agreement in principle was struck, PEMI had no incentive or reason to abandon the set or take any steps to minimize the storage costs. Although Sonalysts did not use the set once it acquired it to produce videos, that was by its choice. Further, it donated the set to a charity and presumably obtained a charitable deduction which reduced its income tax liability.[9]

### C. Reasonable Value

▇▇▇ Having concluded that Sonalysts holds an administrative expense claim relating to the storage charges accruing between March 14, 1997 and June 5, 1997, I must determine the amount of its claim. In this quest, I am guided by "the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him." *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d at 126; *accord In re Dant & Russell, Inc.*, 853 F.2d at 707.

▇▇▇ Under section 503(b)(1)(A) the nondebtor is entitled to recover the reasonable value of the use and occupation of his property. As with the question of "benefit," this involves an objective measurement rather than a subjective determination of what the property was worth to the debtor. *ICS Cybernetics, Inc.*, 111 B.R. at 41 (appropriate measure of reasonable value is the fair market value of the leased property used by the debtor in possession rather than the subjective value to the debtor in possession or the profit or benefit that it netted).

> Using reasonable rental value allows the court to apply an objective standard in determining the benefit to the estate. To use a different standard, such as the extent to which use of the property benefitted the estate, would be too subjective and would lead to different outcomes dependent on the success of the trustee's operation of the business.

4 Lawrence P. King, *et al.*, *Collier on Bankruptcy* ¶ 503.06[6][c][ii], at 503–39 (rev. 15th ed. 1998) ("*Collier*") (footnote omitted).

▇▇▇ The contract rate is presumed to set the reasonable value, but either party may offer evidence to prove a different reasonable value. *In re Dant & Russell, Inc.*, 853 F.2d at 707; *In re Thompson*, 788 F.2d at 563; 4 *Collier* ¶ 503.06[6][c][ii], at 503–40. The court may look to what the creditor charges for the rental of comparable space, *see In re Aerospace Technologies, Inc.*, 199 B.R. at 340, and consider the condition and marketability of the property. *See In re Thompson*, 788 F.2d at 563. Neither PEMI nor Sonalysts offered evidence that the reasonable rental value of the sound stage was not the contract rate of $5,500.00 per week.

▇▇▇ Instead, in opposing the contract rate, PEMI offered evidence that had the set been dismantled and stored on trailers, the cost would have been less than $5,500.00 per week. The debtor does not say who would have paid for the dismantling and storage (presumably Sonalysts), but all this is beside the point. PEMI stored the set at the sound stage, and we are concerned with the reasonable value of what it cost to store the set at that location. There is no rule that measures reasonable value by the cheapest alternative. Charging a debtor a bargain basement rate to occupy a penthouse unjustly enriches the estate at the expense of the nondebtor party.

Further, the debtor's alternative trailer storage proposal was not comparable. J. Keith Green, the debtor's chief executive officer, viewed the set as a show piece, and believed that it would add value to the ultimate selling price of the estate's assets. (Tr. 101, 122–23.) Dismantling the set, enveloping its pieces in protective wrap and squeez-

---

not stand for this broad proposition. In *Mainstream*, the landlord claimed ownership of the property under the terms of the parties' lease, and interfered with the debtor's attempts to remove the property after the lease had been deemed rejected. 134 B.R. at 748–49. Under those circumstances, refusing to allow an administrative expense to the landlord—for storing property the landlord laid claim to and ultimately recovered—is undoubtedly correct. In contrast, all parties recognized that the set was property of the estate, PEMI thought it had value, and sought to preserve it by storing it on the sound stage despite Sonalysts' repeated pleas to remove it.

9. In this regard, the set was built only a couple of years earlier at a cost to PEMI of $365,000.00.

ing them into several trailers was an option the debtor rejected both prior to bankruptcy as well as postpetition. That being the case, the debtor is hard-pressed to argue that this alternative should nonetheless limit the amount of Sonalysts' administrative claim, particularly where Sonalysts would have had to spend the time and money obtaining relief from the stay and then dismantling and storing the debtor's set, all over the debtor's objection.

## CONCLUSION

Sonalysts is entitled to payment of an administrative claim at the weekly rate of $5,500.00, for the period May 14, 1997 through June 5, 1997. I calculate this sum to be to $65,214.29.[10] The foregoing shall constitute my findings of fact and conclusions of law. The parties are directed to settle an order on notice.

---

10. The period bounded by March 14 and June 5, 1997 covers 11.86 weeks. Multiplying this number by the weekly rate of $5,500.00 yields a product of $65,214.29.