### In re SOUTHERN SOYA CORPORATION, Debtors.

### No. 99–06987–W.

United States Bankruptcy Court, D. South Carolina.

May 2, 2000.

**304**

G. William McCarthy, Jr., Columbia, SC, for debtors.

Robert F. Anderson, Columbia, SC, trustee.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Motion to Require Debtor to Pay Post–Petition Loan or Alternatively, Request for Payment of Administrative Claim (the "Motion") filed by The Exchange Bank on March 31, 2000. Southern Soya Corporation ("Debtor"), Thomas L. Harper ("Harper"), and Edisto Farm Credit filed Responses in support of the Motion. On April 11, 2000, a Response to the Motion was also filed by the Official Unsecured Creditors Committee (the "Committee") in which the Committee asserts that the debt for which payment is sought by The Exchange Bank is not entitled to an administrative priority status pursuant to 11 U.S.C. §§ 364 or 503.[1] Bank of America, N.A. also filed a Limited Objection to Motion stating that the bank opposes any payments to The Exchange Bank which would jeopardize Bank of America, N.A.'s cash collateral position in the case.[2] After considering the pleadings filed with the Court and the arguments of counsel at the hearing on the Motion, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[3]

## FINDINGS OF FACT

1. Debtor is the owner of a soybean milling complex in Estill, South Carolina and

---

1. Further references to the Bankruptcy Code shall be by section number only.

2. At the hearing on the Motion, held before the Court on April 14, 2000, Debtor agreed to segregate from the available proceeds the full amount of Bank of America, N.A.'s cash collateral.

3. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

owns other related assets in Allendale and Sumter, South Carolina.

2. On August 19, 1999, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code and still continues to manage its properties and operate its business as debtor-in-possession pursuant to §§ 1107 and 1108.[4]

3. On August 20, 1999, Debtor filed its Motion for Authority to Incur Debt pursuant to § 364(c)(2), § 363, and § 105 in which Debtor sought the approval of a $4,000,000.00 loan from The Exchange Bank.[5] The loan by The Exchange Bank would be partly secured by unencumbered real property owned by Debtor; and, additionally, it would be guaranteed by Debtor's principal, Thomas L. Harper, said guaranty to be secured by real property owned by Mr. Harper.

4. Mr. Harper signed an Unconditional Guaranty on September 3, 1999, which specifically provides that "[t]his Guaranty is and shall remain an unconditional and continuing guaranty of payment and not of collection."

5. The purpose of the loan from The Exchange Bank was to fund necessary operating expenses of Debtor, including operating losses anticipated for the early months of the Chapter 11 case.

6. The key terms of the loan provided for monthly interest payments at the rate of prime plus 1% floating, with a default rate of 12%. The loan also provided that the maturity date would be January 4, 2000, subject to extension upon agreement of the parties and approval of the Court.

7. The only objection to the Motion for Authority to Incur Debt was filed by Bank of America, N.A. .

8. Following a series of hearings and through various orders, the Court authorized Debtor to borrow up to approximately $4,000,000.00 from the Exchange Bank on the above stated terms.

9. On January 12, 2000, Debtor filed a Motion for Order Authorizing Debtor–in–Possession to Obtain Financing Pursuant to §§ 364(c)(2), 363, and 105, in which Debtor sought authority to modify the terms of the loan to extend the maturity date originally set for January 4, 2000. On February 23, 2000, the Court entered an Order granting the extension of the maturity date on the loan until May 4, 2000, with monthly interest payments continuing to be made by Debtor.

10. Since the Court's approval of the loan by The Exchange Bank, Debtor has made draws against the line of credit in the aggregate amount of $3,925,000.[6] As of March 31, 2000, the principal balance of the loan had been reduced to $3,725,000. Under the terms of the loan, interest accrues on the outstanding principal, so the principal reduction has saved interest carrying costs to the estate.

11. On March 30, 2000, Kelley Grain Company's Motion to Convert the case to Chapter 7 was heard before this Court. At the hearing, Debtor represented to the Court that pursuant to the terms of its proposed Chapter 11 Plan, filed on March 22, 2000, it intended to continue operations until approximately May 30, 2000, in an effort to generate funds to pay its post-petition obligations, including its loan to

---

4. Bank of America, N.A. and Kelley Grain Company, two creditors in this case, each filed a Motion to Convert Case from a Chapter 11 to a Chapter 7. The motions were heard before the Court on April 20, 2000, at which hearing the parties announced that the matter had been resolved and that all parties involved consented to Debtor continuing its operation until May 30, 2000 and to the conversion of the case to a Chapter 7 effective May 31, 2000.

5. A Motion for Authority to Incur Debt consistent with the terms outlined above was simultaneously filed in the Chapter 11 case of Thomas L. Harper, Debtor's principal.

6. The remaining available credit of $74,600 is being reserved for payment of interest pursuant to the loan terms approved by the Court.

The Exchange Bank, and to minimize potential damage claims that would result from any breach of post-petition soybean contracts. During the course of the hearing, the Committee and Kelley Grain Company questioned the propriety of Debtor utilizing its operating revenues to pay the post-petition loan due to The Exchange Bank. As a result of these asserted positions, The Exchange Bank filed the Motion which is presently before this Court.

## CONCLUSIONS OF LAW

The Exchange Bank argues that the outstanding amount of the loan made to Debtor should be allowed as an administrative expense pursuant to § 503(b)(1)(A) of the Bankruptcy Code. The Committee objected to the Motion on the grounds that The Exchange Bank secured its loan to Debtor by acquiring a security interest in both Debtor's unencumbered real property and by having Mr. Harper guarantee the loan; therefore, The Exchange Bank should not be allowed to change the nature and security of the loan extended to Debtor. The Committee asserts that had The Exchange Bank looked to Debtor's operations profit, inventory or accounts receivable as security for the loan, it should have sought a lien on such or should have, in the alternative, sought an administrative priority for repayment at the time it made the loan.

### A. Section 364

The first question that the Court must consider is whether the three Orders Authorizing Debtor–in–Possession to Obtain Financing pursuant to 11 U.S.C.

§ 364(c)(2), 363 and 105,[7] which authorized the loan from The Exchange Bank to Debtor, grants The Exchange Bank an administrative priority in conjunction with the explicitly granted secured status under § 364(c)(2). The Committee argues that the original Motion for Authority to Incur Debt filed by Debtor on August 20, 1999, included no reference to § 364(a), (b), or (c)(1), under which an administrative priority for repayment may be authorized by the Court; and, because § 364 sets forth a hierarchy of inducements to prospective lenders, The Exchange Bank, which chose to secure its loan to Debtor though the pledge of real estate, should be precluded at this time from choosing another subsection of § 364 as its security.[8]

Section 364 provides in pertinent part:

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The Court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the trustee is unable to obtain unsecured credit allowable under section

---

7. On August 27, 1999, the Court entered the first Order Authorizing Debtor–in–Possession to Obtain Financing Pursuant to 11 U.S.C. § 364(c)(2), 363 and 105. The Order granted Debtor's motion for authorization to obtain post-petition financing in the amount of $1,600,000.00. On September 10, 1999, the Court entered the Second Order Authorizing Debtor–in–Possession to Obtain Financing Pursuant to 11 U.S.C. § 364(c)(2), 363 and 105, granting Debtor the authority to obtain financing from The Exchange Bank up to $940,000. Finally, on September 14, 1999, the Court entered the Final Order Authorizing

Debtor–in–Possession to Obtain Financing Pursuant to 11 U.S.C. § 364(c)(2), 363 and 105, granting Debtor the authority to obtain financing up to an additional $1,500,000.00.

8. The Committee has not raised the issue of whether The Exchange Bank should be made to satisfy this claim from the sale of Thomas L. Harper's real property subject to the bank's mortgage under a marshaling of assets theory; therefore, the Court will not address such argument.

503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

The Court finds that the Committee is correct to the extent that "[t]he subdivisions of Code § 364(c) are in the alternative; the authorization of credit under one does not imply authorization under another absent application for such additional relief." *In re Sobiech*, 125 B.R. 110, 115 (Bankr.S.D.N.Y.1991); *aff'd* 131 B.R. 917 (S.D.N.Y.1991). However, this Court finds that the fact that § 364 sets forth an "escalating series of inducements" and that a creditor who chooses to acquire the position under one subsection may not "fall back" to the position that a creditor would have under a different subsection does not in itself preclude the creditor from seeking repayment of a debt as an administrative expense pursuant to § 503(b). This premise is supported by various cases. *See, e.g., In re Sobiech*, 125 B.R. at 114–15 n. 2; *Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assoc.)*, 87 B.R. 835, 840–41 (Bankr.S.D.N.Y.1988); *aff'd* 881 F.2d 6 (2d Cir.1989); *In re Pizza Hawaii, Inc.*, 69 B.R. 60, 61–62 (Bankr.D.Hawai'i 1986).

In *In re Photo Promotion Assoc.*, Colorchrome was unwilling to extend unsecured credit to the debtor-in-possession in the ordinary course of business pursuant to § 364(a). As a result, Colorchrome sought to secure its photo finishing charges to the debtor by obtaining an assignment of the debtor's accounts receivable. However, Colorchrome's attempt to acquire a secured position failed because it did not get the bankruptcy court's authorization as required by § 364(c). Colorchrome argued that a creditor who has attempted to acquire secured status pursuant to § 364(c) but has failed in doing so is entitled to "fall back" to § 364(a) or alternatively should be entitled to an administrative status pursuant to § 503(b)(1). As to the ability of the creditor to "fall back" on a separate subsection, the court concluded:

There are no cases supporting Colorchrome's "fall back" argument because 11 U.S.C. § 364 was not structured to give a creditor, who violates the requirement under 11 U.S.C. § 364(c) for court approval, two bites of the apple and to be able to "fall back" to the position of a creditor who was willing to extend unsecured credit to a debtor pursuant to 11 U.S.C. § 364(a). If Colorchrome qualifies for administrative priority status it will be because of the application of another section of the Bankruptcy Code and not because Colorchrome may "fall back" from subsection (c) to subsection (a) in the same section.

*In re Photo Promotion Assoc., Inc.*, 87 B.R. at 840; *see also In re Pizza of Hawaii, Inc.*, 69 B.R. at 61. The court then proceeded to determine whether the claim should be granted administrative expense status pursuant to § 503 and concluded that "[t]he fact that Colorchrome was not induced to extend unsecured credit to the debtor pursuant to 11 U.S.C. § 364(a) does not preclude Colorchrome from asserting an administrative priority claim for the actual and necessary expenses which it incurred in preserving the orders from the debtor's customers." *Id.* at 840–41. The court ultimately concluded that, after remitting all proceeds from the debtor's customers to the Trustee, Colorchrome could then assert the unpaid processing and shipping charges incurred in completing the debtor's orders as an administrative expense under § 503(b)(1)(A). Similarly, this Court finds that even though The Exchange Bank is precluded from requesting that it be granted status pursuant to

another subsection of § 364 other than (c)(2), it is not precluded from requesting an administrative expense allowance under § 503.

### B. Section 503 and Administrative Expenses

■ Thus, the next issue before the Court is whether The Exchange Bank's loan to Debtor should be granted administrative expense status. Section 503(b)(1)(A) provides that a claim should be allowed administrative expense priority if it was for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." The main purpose behind granting administrative expense status to certain expenses of a debtor is to induce creditors and landlords to continue doing business with the debtor or to enter into new loans or contracts. *See, e.g., In re Merry–Go–Round Enter. Inc.,* 180 F.3d 149, 158 (4th Cir.1999); *see also Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.),* 978 F.2d 1409 (5th Cir.1992) (quoting *In re Coastal Carriers Corp.,* 128 B.R. 400, 403 (Bankr.D.Md. 1991)) ("The purpose of Section 503 is to permit the debtor's business to operate for the benefit of its pre-petition creditors. In order to effectuate a successful reorganization, third parties must be willing to furnish post-petition goods or services on credit. Third parties might refuse to extend credit to debtors-in-possession for fear that their claims would not be paid, but an advance payment requirement would impede the debtor's business. Sec-

tion 503 requires that such claims be given priority, therefore inducing third parties to extend credit and enhancing the likelihood of a successful reorganization.").

■ The claimant, in this case The Exchange Bank, has the burden to prove its entitlement to the administrative priority by a preponderance of the evidence. *See, e.g., In re Merry–Go–Round,* 180 F.3d at 157; *In re Knoth,* C/A No. 93–75478–B (Bankr.D.S.C.2/5/1996) (citing *In re Bellman Farms,* 140 B.R. 986, 995 (Bankr. D.S.D.1991)). The general rule is that, in order for a claim to be qualified as an administrative expense, the claimant must prove that (a) it arises from a transaction entered into post-petition with the debtor-in-possession, and (2) it must directly and substantially benefit the estate. *See, e.g., In re Merry–Go–Round,* 180 F.3d at 157; *In re Jartran, Inc.,* 732 F.2d 584, 586–86 (7th Cir.1984); *In re Economy Lodging Sys., Inc.,* 226 B.R. 840, 846–47 (Bankr. N.D.Ohio 1998); *aff'd* 234 B.R. 691 (6th Cir. BAP 1999); *see also In re Cappelmann,* C/A No. 94–75599–W (Bankr. D.S.C.12/23/1996) (quoting *In re Knoth,* C/A No. 93–75478–B (Bankr. D.S.C.2/5/1996)) ("When expenses are incurred without the authorization or approval of the trustee, the expenses must meet the following three criteria for allowance as administrate expenses: (1) they must be actual expenses; (2) they must be necessary to the preservation of the bankruptcy estate; and (3) the creditor must have undertaken the expenses in order to benefit the bankruptcy estate as a whole, not to further his own self-interest.").[9]

---

9. If a debt does not arise from a transaction with the debtor-in-possession, it may still be accorded administrative priority if the creditor gave consideration to the debtor-in-possession. *See, e.g., In re Lunan Family Restaurants,* 194 B.R. 429, 449 (Bankr.N.D.Ill.1996); *see also In re Patient Educ. Media, Inc.,* 221 B.R. 97, 101–02 (Bankr.S.D.N.Y.1998) (citations omitted) ("The party asserting the status of an administrative claimant has the burden of proof. He must demonstrate that (1) his claim arose from a transaction with or on

account of consideration furnished to the debtor-in-possession, and (2) the transaction or consideration directly benefitted the debtor-in-possession."). "Consideration is furnished to the estate only where the debtor-in-possession induces post-petition performance or where performance on a contract not rejected by the debtor-in-possession is rendered to the estate." *In re Lunan Family Restaurants,* 194 B.R. at 449; *see also In re Patient Educ. Media, Inc.,* 221 B.R. at 101–02.

In the case presently before the Court, there is no argument as to the fact that the loan by The Exchange Bank arose from a post-petition transaction entered into between claimant and the debtor-in-possession and approved by the Court. The only factor that merits further consideration by the Court is the second requirement dealing with the issue of whether the loan benefitted the estate. Courts have generally held that "[a] claim is not rendered a post-petition administrative priority claim merely by the fact that the time for payment is triggered by an event that happens after the filing of the petition." *In re DeMert & Dougherty, Inc.*, 227 B.R. 508, 512 (Bankr.N.D.Ill.1998); *see also In re Sobiech*, 125 B.R. 110, 115 (Bankr. S.D.N.Y.1991) ("The mere fact that credit was extended in a post-petition period does not mean that an administrative priority will automatically attach, notwithstanding the origin of the credit."); *Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assoc.)*, 87 B.R. 835, 839 (Bankr. S.D.N.Y.1988) (same). The court's inquiry as to whether an administrative expense should be granted centers around whether the estate received an actual benefit. As previously noted in this district,

> "Section 503(b) . . . must be narrowly construed. This . . . narrow interpretation requires actual use of the creditor's property by the debtor, thereby conferring a concrete benefit on the estate before a claim is allowable as an administrative expense. Accordingly, the mere potential of benefit to the estate is insufficient for the claim to acquire status as an administrative expense. The court's administrative expense inquiry centers upon whether the estate has received an actual benefit, as opposed to the loss a creditor might experience by virtue of the debtor's possession of his property."

*In re Cappelmann*, C/A No. 94–75599–W (Bankr.D.S.C.12/23/1996) (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir.1994)).

The Committee argues that The Exchange Bank's debt should not be granted administrative expense status because the loan did not ultimately benefit the estate in that, since the filing of the bankruptcy petition, Debtor has continuously operated at a loss and the credit extended by The Exchange Bank was a mere prelude to the ultimate liquidation of Debtor's business. The Committee looks to the outcome of the bankruptcy case to conclude that the loan did not benefit the estate which will ultimately be liquidated when the case is converted to a Chapter 7 effective May 31, 2000. However, several courts have observed that the outcome of the bankruptcy case is not conclusive indicia of whether the extension of credit was beneficial to the estate. *See, e.g., In re Molnar Brothers*, 200 B.R. 555 (Bankr. D.N.J.1996); *White Front Feed & Seed v. State Nat'l Bank (In re Ramaker)*, 117 B.R. 959 (Bankr.N.D.Iowa 1990).

In *In re Molnar Brothers*, the debtor filed a plan of reorganization under Chapter 12 of the Bankruptcy Code which provided that creditors would be paid out of the proceeds of the sale of the estate's assets. Plant Food filed an administrative claim seeking to be compensated for providing seed and fertilizer purchased by the debtor-in-possession. Plant Food contended that the seed and chemicals offered a benefit to the debtor and the estate in that they were used in the planting operation of the farm and to feed cattle. However, the United States and the Trustee argued that because the debtor operated the farm under a liquidating plan, the products did not add any value to the estate. The court held that "the outcome of the bankruptcy is not the exclusive determination in projecting whether the transaction was beneficial to the estate," and concluded that because "the feeding of the livestock was an essential activity while the Farm was listed for sale . . . through the auction date . . . and that the 1993 crop was utilized as an actual and necessary expense of maintaining the Debtor's estate for that peri-

od," Plant Food's claim warranted administrative expense status pursuant to § 503(b)(1)(A). *Id.* at 559; *see also In re Ramaker,* 117 B.R. at 961 (citation omitted) (emphasis added) ("The outcome of the bankruptcy ... is not the test. It is whether the transaction was beneficial to the debtor-in-possession 'in the operation of the business.' Despite the fact that the reorganization failed, and despite the evidence that the 1988 crop was a poor one, White's credit sales of goods *were still beneficial to the debtors-in-possession in the operation of the farm business.* This court does not accept the hindsight argument that feed, seed, and fertilizer are not necessary expenses of a crop and livestock farming operation merely because the reorganization later fails.").

Similarly, in this case, the Court finds that The Exchange Bank's debt against Debtor should be granted an administrative expense status. The loan that The Exchange Bank extended to Debtor was an "actual" and "necessary" expense which benefitted the estate. The Court recognizes that Debtor's attempt to reorganize its business operations under Chapter 11 has apparently failed and that the parties have all consented to Debtor continuing its operation until May 30, 2000 at which time the case will be converted to a Chapter 7; but such inability to rehabilitate the business does not *per se* preclude a finding that The Exchange Bank's loan should be accorded the priority of an administrative expense. The funds that the bank extended were used by Debtor in the continuation of its soybean operations; without such funds Debtor's business would have closed long before May 30, 2000. At the hearing on the Motion, Debtor represented that continuation of operations would avoid the risk of incurring substantial administrative claims against the estate that would potentially arise from its inability to fulfill post-petition contractual obligations if there were an immediate cessation of operations. Therefore, the Court finds that the money that was actually utilized by Debtor in the operation of its business was a necessary cost and expense which warrants the granting of administrative expense status pursuant to § 503(b)(1)(A). *See, e.g., Ford Motor v. Dobbins,* 35 F.3d 860, 867 (4th Cir.1994) (emphasis added) ("That which is actually utilized by a Trustee *in the operation of a debtor's business* is a necessary cost and expense of preserving the estate [under § 503(b)] and should be accorded the priority of an administrative expense.' ").[10] At the time of the loan,

---

10. In support of its position, the Committee cites the case of *In re C.E.N., Inc.,* 86 B.R. 303 (Bankr.D.Me.1988). In that case, shortly after the filing of the Chapter 11 petition, the president and sole shareholder of the corporate debtor made several advances to debtor that were needed to meet payroll expenses and bills. The creditor then sought reimbursement of the advances as an administrative expense status and argued that, pursuant to § 364(a), the debt was incurred in the ordinary course of business of the debtor. It was clear that the debtor was incurring the expenses not in an attempt to continue the operation of the business, but rather in an attempt to hold on to its assets until the estate was liquidated. The court ultimately held that the debtor's president could not acquire administrative status under § 364(a) because the debt was not incurred in the ordinary course of business. The court noted:

It is true that the type of expenses incurred in this case are common to virtually all business. If the debtor was incurring these expenses to further the business in pursuit of reorganization another conclusion might be warranted. But debtor's incurrence of these expenses was not in the ordinary course of business because the debtor was not continuing the business but preparing to sell its principal asset.

*Id.* at 305. The court then continued with an analysis under § 503(b)(1), independent of § 364, and concluded that the claim was not for an actual and necessary expense of preserving the estate in that "[the president and sole shareholder's] advances were made to protect his own interests and not the interests of general creditors." *Id.* at 306. This Court finds that this case, which is cited by the Committee in support of its position, is distinguishable from the factual and legal situation presently before the Court. In this case, the legal determination that remains before the Court is whether The Exchange Bank's claim meets the requirement of § 503(b)(1)(A) in

Debtor was apparently honestly pursuing rehabilitation of the business. But for the loan extended by The Exchange Bank, Debtor would have been unable to operate its business, which appeared at the time to be in the best interest of general unsecured creditors.

### C. Timeliness of Administrative Claims

■ Another ground on which the Committee objected is the tardiness of the administrative claim. The Committee argues that the request by The Exchange Bank has not been timely filed and that the appropriate time to have sought administrative priority under § 503(b)(1)(A) would have been at the time the original Motion for Authority to Incur Debt pursuant to § 364(c)(2), 363, and 105 was filed. Section 503(b)(1)(A) provides: "An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause." Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure, however, set forth a deadline within which administrative claims must be filed; rather, "courts can exercise their discretion in setting bar dates according to the circumstances of each case." 4 *Collier on Bankruptcy* ¶ 503.02[2] (15th ed. rev. 1997). This Court finds that The Exchange Bank's request for an administrative claim in this case was timely. The Committee argues that the administrative claim should have been requested along with the original Motion for Authority to Incur Debt. As discussed in detail above, the test to determine if a claim should be granted administrative expense status involves the determination of whether the advance benefitted the estate. Such a determination should be made when the Court can consider the events necessary to make a full and fair assessment of whether the transaction did, in fact, provide a bene-

fit to the estate. In this case, the administrative claim was requested immediately after the hearing on Kelley Grain Company's Motion to Convert the case to a Chapter 7, when the Committee and Kelley Grain Company raised for the first time the propriety of utilizing Debtor's operating revenues to pay the post-petition loan; thus, the Court concludes that it was timely.

### D. Guaranty by Thomas L. Harper

■ After the Committee was given further opportunity to review the loan documents governing the loan from The Exchange Bank to Debtor, it submitted a Supplemental Response to the Motion, in which it argued that the guaranties executed by Mr. Harper clearly establish that he is a primary obligor on the loan. Furthermore, the Committee points to the language in the Unconditional Guaranty signed by Mr. Harper on September 3, 1999, which provides that "[t]his Guaranty is and shall remain an unconditional and continuing guaranty of payment and not of collection" and asserts that "Guarantor acknowledges that Guarantor's liabilities and obligations hereunder are primary rather than secondary." The Committee maintains that when such language is contained in a guaranty, the lender may maintain an action directly against the guarantor without first bringing an action against the borrower or any collateral. This Court finds that the Committee's reasoning is correct to the extent that the lender can seek recovery from the guarantor without first attempting recovery from the borrower; however, this premise in itself does not warrant the Court's denial of the Motion when given the fact that the loan's repayment is not overdue, its maturity date is May 4, 2000.

order to be granted administrative expense status. The Exchange Bank, unlike the creditor in *In re C.E.N.*, 86 B.R. 303, is not an insider of Debtor, but rather an independent

party who openly provided a loan, through the Court's approval, to aid Debtor in continuing its business operations.

 There is no dispute as to the fact that Mr. Harper's guaranty is an absolute and unconditional guaranty of payment as opposed to a guaranty of collection. The difference between the two types of guaranty is as follows: "Under an absolute guaranty of payment, the creditor may maintain an action against the guarantor immediately *upon default of the debtor.* A guaranty of collection conditions liability of the guarantor upon prosecution of the primary debtor without success." *Peoples Fed. Savings & Loan Assoc. v. Myrtle Beach Retirement Group, Inc.,* 300 S.C. 277, 387 S.E.2d 672, 674 (1989) (emphasis added); *see also Citizens and Southern Nat'l Bank v. Lanford,* 313 S.C. 540, 443 S.E.2d 549, 550 (1994) (citations omitted) ("A guaranty of payment is an absolute or unconditional promise to pay a particular debt if it is not paid by the debtor at maturity. Under an absolute guaranty of payment, the creditor may maintain an action against the guarantor immediately upon default of the debtor."). There is no question that the guaranty and pledge of collateral by Mr. Harper were important reasons to The Exchange Bank's decision to extend the loan. However, the structure of the loan transaction indicates the expectation that Debtor be held liable as the initial obligor on the loan and remain responsible for repayment from its assets. Thus, the initial obligation to repay the funds pursuant to the terms of the loan documents is still that of Debtor; however, The Exchange Bank could turn to Mr. Harper in order to pursue its debt, but any remedial rights that it has under the guaranty arise only in the case Debtor defaults, which cannot occur until after May 4, 2000. From the foregoing arguments, the Court concludes that Debtor may pay the administrative claim of The Exchange Bank on par with other § 503(b) administrative claims in the case.[11]

## CONCLUSION

From the foregoing arguments, it is therefore

11. The Court notes that The Exchange Bank never requested and the factual and legal

ORDERED that The Exchange Bank's Motion to Request Payment of Administrative Claim is granted and the loan that The Exchange Bank extended to Debtor is granted administrative expense status pursuant to § 503(b)(1)(A).

**AND IT IS SO ORDERED.**

circumstances of the case do not warrant super-priority status.