DARBY ET AL. *v.* THE BALTIMORE AND OHIO RAILROAD COMPANY ET AL.

[No. 85, September Term, 1970.]

*Decided November 11, 1970.*

494

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*Earl E. Manges* and *Thomas N. Berry* for appellants.

*Charles N. Marshall* and *David W. Byron,* with whom were *Daniel W. Moylan* and *Bushong, Byron, Moylan & Urner* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

We have had occasion in the past to note the reluctance with which members of our bar have come to grips with the provisions of the Uniform Commercial Code (the U.C.C.), Maryland Code (1957, 1964 Repl. Vol.) Art. 95B, *Wilke, Inc. v. Cummins Diesel Engines, Inc.,* 252 Md. 611, 250 A. 2d 886 (1969). In this case, we encounter an antithetical situation in which a creditor, in its eagerness to have its claim for storage charges given preferential status, sought to enforce a lien which in our view was not available to it under the U.C.C.

In 1967, the appellant Darby, who was engaged in the business of restoring privately-owned railroad cars, leased two sidings from one of the appellees, The Baltimore and

Ohio Railroad Company (the Railroad) for the storage of private cars. One siding, known as the Antietam Siding, was 330 feet long; the other, the Danzer Metal Siding, was 365 feet long.[1] Both were located in Hagerstown. The agreement respecting the Antietam Siding was dated 1 July 1967 and called for a rent of $1,000 per year, of which $330 was attributed to 330 lineal feet of siding and the balance to a 2,000 square foot freight shed adjacent to the siding. The Danzer Metal Siding was covered by an agreement dated 1 October 1967 and called for a rent of $365 per year, or $1.00 per lineal foot of track. Both agreements were virtually identical, and although called licensing agreements, were treated as leases by the parties. The agreements provided for termination by either party at any time on 30 days' notice. Ultimately, Darby brought 20 cars to Hagerstown. Obviously, not all of the cars could be accommodated on 695 lineal feet of leased siding and while the record does not disclose where the cars were located, Darby testified that some of them were on sidings leased from owners other than the Railroad.

It is impossible from the scanty record before us to identify the genesis of the dispute with any certainty. Darby testified that the Danzer Metal Siding which he leased under the agreement of 1 October 1967 was not made available to him until 2 July 1968 and that the Railroad promised to up-date the lease, or make an adjustment in the rent, but never did so. On 22 September 1969 the Railroad gave Darby notice of the termination of both leases. Thereafter, according to Darby, the Railroad charged for storage of cars located on its tracks at the rate of $3.37 per car per day.

On 3 February 1970 the Railroad determined to sell the 20 cars at public sale to satisfy what it conceived to be its carrier's lien for unpaid storage charges, and 19 of the cars were, in fact, sold at public auction on 24 February 1970.

---

1. Darby entered into the agreements in his individual capacity and trading as Darby Wood Products. Mrs. Darby joined in the lease for the Antietam Siding but not for the Danzer Metal Siding.

On the morning of the day of sale Darby and the appellant, Custom Railroad Service, Inc., had sought by a petition filed in equity in the Circuit Court for Washington County against the Railroad and its counsel, as its agent, to enjoin the sale.[2] An ex parte injunction was issued and then was vacated almost immediately, apparently because Darby had failed to post a bond called for by Maryland Rule BB75 a. By agreement of counsel, the proceeds of sale were held subject to the further order of court. The record does not reveal the amount realized by the sale of the cars, nor the identity of the purchasers.

About a month after the sale, the matter came on for hearing on petition and answer. From an order dismissing the petition, Darby and Custom Railroad Service, Inc., have appealed. After the appeal was taken, the Railroad moved to dismiss on the ground that since the sale had been held and the cars delivered to purchasers the case had become moot, relying on *Woodson Apartments, Inc. v. Denick*, 236 Md. 631, 204 A. 2d 564 (1964) ; *Basiliko v. Welsh*, 219 Md. 602, 150 A. 2d 220 (1959) and *Bowles v. M. P. Moller, Inc.*, 163 Md. 670, 164 A. 665 (1933), which when read in conjunction with *Maddox v. District Supply, Inc.*, 222 Md. 31, 158 A. 2d 650 (1960) are authority for the proposition that since only the posting of a supersedeas bond as provided by Rule 817 a will stay the ratification of a judicial sale to a purchaser, when no bond is posted the court has lost jurisdiction over the res, and the appeal will be dismissed for mootness under Rule 835 b (8). This is a rule applicable to judicial sales, and we know of no reason why it should be extended to a non-judicial sale made by the Railroad under a right which it conceived to have by statute, *Ridgely v. Iglehart*, 3 Bland 540, 548; *Athens Electric Supply Co. v. Delta Oil, Inc.*, 101 Ga. App. 515, 114 S.E.2d 289 (1960) ; *Finkel v. Kushner*, 183 Misc. 64, 48 N.Y.S.2d 717, *aff'd* 268 App. Div. 912, 51 N.Y.S.2d 756 (1944) ; *compare Durst v. Durst*, 225 Md. 175, 169 A. 2d 755 (1961). For this rea-

---

2. Darby described himself as sales manager of Custom Railroad Service, Inc.

son we shall deny the motion to dismiss, and consider the effect of the notice hereafter.

The narrow question posed by this appeal is whether the Railroad had a carrier's lien under U.C.C. § 7-307 which it could enforce under § 7-308.[3] The Official Com-

---

3. Code, Art. 95B §§ 7-307 and 7-308 provide:

"§ 7-307. Lien of carrier.

(1) A carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods or incident to their transportation or reasonably incurred in their sale pursuant to law. But against a purchaser for value of a negotiable bill of lading a carrier's lien is limited to charges stated in the bill or the applicable tariffs, or if no charges are stated then to a reasonable charge.

(2) A lien for charges and expenses under subsection (1) on goods which the carrier was required by law to receive for transportation is effective against the consignor or any person entitled to the goods unless the carrier had notice that the consignor lacked authority to subject the goods to such charges and expenses. Any other lien under subsection (1) is effective against the consignor and any person who permitted the bailor to have control or possession of the goods unless the carrier had notice that the bailor lacked such authority.

(3) A carrier loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.

"7-308. Enforcement of carrier's lien.

(1) A carrier's lien may be enforced by public or private sale of the goods, in bloc or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the carrier is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the carrier either sells the goods in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with commercially reasonable practices among dealers in the type of goods sold he has sold in a commercially reasonable manner. A sale of more goods than apparently necessary to be offered to ensure satisfaction of the obligation is not commercially reasonable except in cases covered by the preceding sentence.

(2) Before any sale pursuant to this section any person claiming a right in the goods may pay the amount neces-

ment to these sections points out that in giving the carrier a lien for storage, preservation of the goods, demurrage and terminal charges, the U.C.C. has extended to a carrier a specific lien for charges and expenses similar to that formerly given warehousemen under §§ 27 through 32 of the Uniform Warehouse Receipts Act.[4] See 1 Hawkland, *A Transactional Guide to The Uniform Commercial Code* § 1.690103 (1964) at 326-29; 2 *Anderson's Uniform Commercial Code* (1961) at 275 ff.

As we see it, however, two conditions must be met if the carrier is to claim a lien under the U.C.C. First, the lien attaches only to "goods covered by a bill of lading," § 7-307 (1). Second, the lien may be lost on goods voluntarily delivered by the carrier, § 7-307 (3). "The validity of the carrier's specific lien is dependent on continuous possession. If the carrier voluntarily gives up possession of the goods, the lien is lost." Hawkland, *supra,* at 328.

There is no evidence before us indicating that the pri-

---

sary to satisfy the lien and the reasonable expenses incurred under this section. In that event the goods must not be sold, but must be retained by the carrier subject to the terms of the bill and this subtitle.

(3) The carrier may buy at any public sale pursuant to this section.

(4) A purchaser in good faith of goods sold to enforce a carrier's lien takes the goods free of any rights of persons against whom the lien was valid, despite non-compliance by the carrier with the requirements of this section.

(5) The carrier may satisfy his lien from the proceeds of any sale pursuant to this section but must hold the balance, if any, for delivery on demand to any person to whom he would have been bound to deliver the goods.

(6) The rights provided by this section shall be in addition to all other rights allowed by law to a creditor against his debtor.

(7) A carrier's lien may be enforced in accordance with either subsection (1) or the procedure set forth in subsection (2) of § 7-210.

(8) The carrier is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion."

4. Under Uniform Bills of Lading Act § 26, Code (1957) Art. 14 § 26, which has been supplanted by the U.C.C., the carrier was given such a lien only as to goods shipped under a *negotiable* bill of lading, Braucher, "Documents of Title Under the Uniform Commercial Code" (1955) at 42.

vately owned railroad cars were shipped to Hagerstown under bills of lading. Assuming, for purposes of this opinion, that they were—and at argument, the parties seemed to concede this—and assuming without deciding that private cars are "goods" within the contemplation of § 7-307 (1), it would seem that the bills of lading must have been cancelled when the Railroad delivered the cars to Darby, and would not have come into being again until Darby reconsigned the cars to the carrier.

Moreover, when Darby took possession of the cars, the Railroad lost its lien on the "goods which [it] voluntarily deliver[ed]," § 7-307 (3). On direct examination, Darby testified:

> "The cars were placed in our possession for the purpose of doing work or to hold into inventory until work could be done on them at a time which is convenient to either the customer and us * * *. The cars would be worked on as the orders demanded it or as the need for the car arose * * *."

Consequently, once the Railroad delivered the cars to Darby, it would appear that it lost any lien under § 7-307 which was subject to enforcement under § 7-308. Even if we assume that the requirements of § 7-308 were meticulously observed, the sale amounted to a conversion, *Saunders v. Mullinix,* 195 Md. 235, 72 A. 2d 720 (1949); *Gelb v. Zimet Bros., Inc.,* 34 Misc. 2d 401, 228 N.Y.S.2d 111 (1962); *Pennsylvania Railroad Co. v. Gentile Bros. Co.,* 47 Ohio App. 162, 191 N. E. 369 (1934), and should have been enjoined, and once held, should be invalidated. This result makes unnecessary a consideration of Darby's contention that the trial court erred in its rulings on the admission of evidence and testimony.

In support of its motion to dismiss, the Railroad says that substantially all of the cars have been sold and delivered and that we are without power to interfere. Darby's rejoinder is that at time of sale, all persons were notified that the sale was being made subject to the further

orders of the Circuit Court for Washington County, so that the thrust of his appeal is not focused solely on the sale proceeds but on the validity of the sale itself. It must be remembered that the only testimony below was Darby's, and that this was uncontroverted. The record before us does not disclose what the total amount of the storage charges was, to which cars storage charges were applicable, where the cars were located, who owned the cars, what announcement was made at the sale, who purchased the cars at the sale, at what price they were sold, or where the cars now are.

We intend to do no violence to the rule that courts should issue no order which would be nugatory, *Eberts v. Congressional Country Club, Inc.*, 197 Md. 461, 464, 79 A. 2d 518 (1951) but the extent of the court's power, in this case, hinges on facts which are not before us. There are crucial evidential questions which will have to be determined by the circuit court on remand. The Railroad will then have an opportunity to show, if it can, that the cars were covered by bills of lading, or had not been delivered to Darby. Whether the court has the jurisdiction necessary for it to require a return of the cars will be for it to decide. If it does not have the power to order a return of the cars, either Darby, Custom Railroad Service, Inc., or the owners of the cars may be entitled to the proceeds of sale. Whether or not it has the power to require the return of the cars, one or more of the persons entitled may be able to hold the Railroad answerable in damages at law.

*Motion to dismiss appeal denied; order dismissing petition reversed, and case remanded for further proceedings conformable with this opinion. Costs on appeal and below to be paid by appellee, The Baltimore and Ohio Railroad Company.*