under section 1327(a) a tax purchaser seeking to modify the stay might be bound by a property owner's "confirmed plan of which it had notice").

It is important to note, finally, that NIC has never complained that it lacked notice of the debtors' bankruptcy. Plainly, NIC did have notice.[10] NIC elected instead to stand on the principle that as a tax purchaser it was not a "creditor" with a "claim" in the bankruptcy and so could ignore the bankruptcy proceedings with impunity. But principles can prove expensive, as this case illustrates. NIC chose to let the debtors' plan treating its claim be confirmed without objection. NIC "must live with its procedural choice." *Pence*, 905 F.2d at 1107.

### 4. Conclusion

The motion of National Indemnity Corporation to modify the automatic stay is denied.

**In re UAL CORPORATION, et al., Debtors.**

**No. 02 B 48191.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Aug. 28, 2003.

---

**10.** Had NIC received no notice of the bankruptcy this would be a different case. NIC would then have a valid complaint that it had been denied due process and so would have a legitimate post-confirmation basis for attacking the plan. *See Pence,* 905 F.2d at 1109; *Puckett,* 193 B.R. at 848. But although NIC did not receive much in the way of notice, the notice NIC did receive was sufficient. Before the debtors' second amended plan was confirmed, the proof of claim and amended plan apprised NIC that the bankruptcy was pending and would involve its claim. Due process required no more. *Pence,* 905 F.2d at 1109. Sophisticated creditors—including institutional tax purchasers—who learn of a bankruptcy proceeding have an obligation to follow its administration "to determine what aspects of the proceeding they may want to challenge." *Id.* Once notified, NIC could not "stick its head in the sand and pretend it would not lose any rights by not participating in the proceeding." *Id.*

Brian D. Sieve, Michael B. Slade, Paul J. Ferak, Kirkland & Ellis, Chicago, IL, for Debtors.

Sidney K. Swinson, Gable & Gotwals, Tulsa, OK, Paula K. Jacobi, Sugar, Friedberg & Felsenthal, Chicago, IL, for Explorer Pipeline Company.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Chief Judge.

These cases have come before the court on the motion of Explorer Pipeline Company ("Explorer") for adequate protection, asserting liens (1) on aviation fuel owned by one of the debtors and in the possession of Explorer, and (2) on the cash proceeds of sales of aviation fuel that Explorer delivered after the filing of this case. The debtors have opposed the motion on the basis that Explorer has no lien enforceable in bankruptcy requiring adequate protection. As discussed below, the debtors' position is correct; accordingly, Explorer's motion is denied.

### Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of the pending case. When presiding over a referred case, a bankruptcy judge has jurisdiction, under 28 U.S.C. § 157(b)(1), to enter appropriate orders and judgments in core proceedings within the case. The pending motion for adequate protection is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and (b)(2)(K) (determinations of the validi-

ty, extent, or priority of liens). This court therefore has jurisdiction to enter a final order with respect to the matter now before it.

## Statement of Facts

Explorer Pipeline Company, headquartered in Tulsa, Oklahoma, is a common carrier of refined petroleum through an interstate pipeline. Tr. 46.[1] Explorer's pipeline extends from refineries in Texas and Louisiana on the Gulf of Mexico, through destinations in Texas and Oklahoma, to a terminal in Hammond, Indiana. *Id.* Explorer is subject to regulation by the Federal Energy Regulatory Commission ("FERC"), and pursuant to this regulation, Explorer is required to publish FERC-approved tariffs containing the terms and rates under which it is willing to do business. Tr. 51–52.

Explorer's practice is to allocate space in its pipeline to its customers each month, based on the customers' "nominations" of their intended shipment volume for the month in question. Tr. 81–84. Each month, Explorer transports petroleum products in three cycles and allows its customers to choose which cycle to use for shipment. Tr. 84. At the time the customer provides product to Explorer for shipment, Explorer issues a meter ticket receipt, showing a batch number. Tr. 84, UAF Ex. 13. Explorer is then responsible for delivery of the quantity and quality of product reflected in the receipt within the cycle, but Explorer is not required to deliver the identical product that it received from the customer, since refined petroleum products of a particular grade are fungible and may be commingled for pipeline shipment. Tr. 65. Explorer meters the amount of product upon delivery, and the meter ticket indicates its transfer of custody of the product. Tr. 89–90.

United Aviation Fuels Corporation ("UAF"), one of the debtors in these consolidated bankruptcy cases, is in the business of purchasing and transporting aviation fuel for the use of affiliated corporations and other parties. In the course of this business, UAF has contracted with Explorer. Tr. 55–56. It was the practice of Explorer to bill UAF only after delivery of product on UAF's behalf, on the first and fifteenth of the month following the delivery. Tr. 90.

On August 27, 2001, Explorer prepared a letter proposing "volume incentive rates," and UAF accepted this proposal on August 30, 2001. Explorer Ex. 1 (the "Letter Agreement"). The Letter Agreement provided UAF with discounts from the otherwise applicable shipping charges in consideration for UAF's agreement to ship a minimum of 9 million barrels annually for each of the two years between September 1, 2001, and August 31, 2003. The agreement also required UAF to meet monthly minimum shipping amounts, with any deficiency incurring a $1 per barrel penalty. The penalty would become a prepayment for future shipping if used within one year of the termination of the agreement, but otherwise would be forfeited to Explorer. *Id.*

In accordance with FERC regulations, Explorer applied to FERC for, and obtained approval of, tariffs incorporating the terms of the Letter Agreement. Local Pipeline Tariffs Nos. 56–62; Explorer Exs. 2–8. When the issues related to this litigation arose, Tariff No. 59, commencing August 1, 2002, was applicable. Explorer Ex. 5. Item 111 of the tariff reflects the terms of the Letter Agreement. *Id,* at pp. 15–17.

---

1. "Tr." Refers to the Transcript of Proceedings for the hearing on Explorer's motion, conducted on July 1, 2003. "Explorer Ex." and "UAF Ex." refer, respectively, to the exhibits of Explorer and United Aviation Fuels Corporation.

In addition to these terms, the tariffs also provided for a lien. Item 60(b) of Tariff No. 59 states:

> The Shipper shall be responsible for payment of transportation and all other charges applicable to the shipment, and, if required, shall prepay such charges or furnish guaranty of payment satisfactory to the Carrier. The Carrier shall have a lien on all petroleum products accepted for transportation to secure the payment of all charges.

*Id.* at 10.

On December 9, 2002, the debtors, including UAF, filed voluntary petitions for Chapter 11 relief with this court. At that time, UAF owed Explorer $464,056.53 for aviation fuel delivered between November 22, 2002 and December 6, 2002, Tr. 34, 68, and Explorer had more than 272,000 barrels of UAF's undelivered fuel in its possession (the "petition-date fuel"), Explorer Ex. 12. The value of the petition-date fuel exceeded the amount due for the prepetition fuel shipments. Tr. 105. Explorer voluntarily delivered the petition-date fuel to UAF, or its designees, after the petition date. Explorer Motion, ¶ 14. No evidence was presented to establish what use was made of the fuel after delivery. Tr. 95.

Since the petition date, UAF, as debtor in possession, has continued to ship fuel through Explorer's pipeline. Explorer Ex. 13. While UAF has paid for all postpetition deliveries, Tr. 80, the prepetition delivery charges remain largely unpaid, Tr. 34, 68.[2] However, the volume of UAF's fuel in the pipeline—net of the cost of its transport—continues to exceed the amount of Explorer's prepetition transportation claim. Tr. 99 (value of a barrel of fuel is 30 to 35 times the cost of transport), 105 (13–14,000 barrels of fuel would have a value equal to the Explorer's prepetition claim against UAF).

Several months after UAF's bankruptcy filing, on April 30, 2003, Explorer filed the pending motion, seeking an order requiring UAF "to adequately protect Explorer's interest in ... cash collateral and ... jet fuel collateral as a condition of [UAF's] use thereof." Motion at 6. In the motion, Explorer stated that it had delivered the petition-date fuel to UAF based on representations from UAF "that it would obtain authority from the Bankruptcy Court to permit it to pay the pre-petition charges owed by it to Explorer in consideration for Explorer continuing to ship jet fuel." However, the motion did not seek relief based on these alleged representations. Rather, the motion contended (1) that UAF was in possession of cash collateral arising from sales of the prepetition-date fuel, which collateral could not be used without a court order directing adequate protection; (2) that UAF had already used cash collateral arising from the sale of the prepetition-date fuel, in violation of the requirements of the Bankruptcy Code, making the imposition of a replacement lien appropriate; and (3) that Explorer had a continuing lien in the aviation fuel in its pipeline at the time the motion was filed, which lien was entitled to adequate protection. Motion at 4–5.

On May 16, UAF responded to the motion in an Omnibus Objection, asserting that Explorer had no lien in the petition-date fuel because it had delivered that fuel postpetition. The objection did not specifically address Explorer's cash collateral arguments. On May 28, the court issued an order requiring that any discovery in connection with the motion be concluded by June 10 and setting the matter for hearing on June 17. The hearing was later contin-

---

**2.** The charges were reduced by Explorer's exercise of a setoff in the amount of $25,227.53, pursuant to court order of May 23, 2003, leaving a balance of $438,829.

ued to July 1, but the discovery cut-off was not extended. On June 25, Explorer filed a reply brief in support of its motion, asserting for the first time a request for relief based on alleged representations by UAF regarding payments for fuel:

> But for [UAF's] agreement to pay Explorer, Explorer would have sought adequate protection *before* delivering any jet fuel in its possession ... [T]o the extent that Explorer's delivery of [petition-date fuel] to [UAF] over the course of several weeks after the Petition Date affects Explorer's right to adequate protection—and Explorer does not believe that it does—the Debtors should be estopped from relying on that fact.

Reply at 10 n. 7.

Before the hearing, debtors moved to exclude evidence relating to the estoppel theory on the basis that they had been given insufficient notice that this theory would be asserted. The court sustained this objection at the hearing, limiting evidence to the existence of the liens claimed by Explorer.

### Conclusions of Law

Given the court's ruling on Explorer's estoppel claim, the only remaining legal issues in dispute concern the question of whether Explorer has any lien subject to adequate protection. The debtors do not dispute that Explorer would be entitled to adequate protection for whatever lien in cash collateral or aviation fuel that it does retain. And indeed, the right to adequate protection for any such lien is clear under the Bankruptcy Code (Title 11, U.S.C.).[3] Nor do the parties dispute that Oklahoma

law generally supplies the applicable non-bankruptcy law.[4] However, the debtors contend, correctly, that none of the asserted several bases asserted by Explorer for a lien on property of the debtors gives rise to the right to adequate protection.

#### 1. The carrier lien under § 7–307 of the Uniform Commercial Code.

In the course of argument at trial (Tr. 124–25), counsel for Explorer briefly referred to a carrier lien under Article 7 of the Uniform Commercial Code (UCC). What counsel had in mind was Okla. Stat. tit. 12A, § 7–307, which states in part:

> (1) A carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law ...
>
> . . .
>
> (3) A carrier loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.

The lien established by § 7–307 applied to the petition-date fuel. This fuel was "covered by a bill of lading," since the receipts issued by Explorer to UAF fit clearly fit within the UCC's definition of "bill of lading": "a document evidencing the receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods." Okla. Stat. tit. 12A, § 1–201(6).

---

**3.** Under § 363(c) of the Code, if the lienholder does not consent, a debtor may only use cash collateral pursuant to a court order issued on a finding of adequate protection. *In re Gaslight Village, Inc.*, 6 B.R. 871, 875 (Bankr.D.Conn.1980). Similarly, as to non-cash collateral, a lienholder has the right to

adequate protection upon a motion brought under § 363(e) of the Code.

**4.** Since the parties did not discuss choice of law, the court need not examine the issue. *In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir.1993).

■ However, the carrier lien of § 7–307 is, by its terms, limited in two respects relevant to this case. First, the lien applies only to the expenses of storage and transportation of the goods covered by a particular bill of lading, not to costs associated with prior deliveries or other obligations of the shipper to the carrier. *See In re Lissner Corp.*, 98 B.R. 812, 818 n. 2 (N.D.Ill.1989) ("Since carriers do not generally claim a lien for charges in relation to other goods or lend money on the security of goods in their possession, there are no provisions for a general lien or a security interest in Section 7–307.") Thus, rather than securing the entire $464,056.53 that UAF owed Explorer for prepetition deliveries, the lien on UAF's petition-date fuel secured only Explorer's claim for delivery of the petition-date fuel itself. The evidence at trial did not establish the amount of this lien,[5] but this is of no moment. Whatever the charges were, UAF paid them, together with all other charges on fuel delivered after the bankruptcy filing.

■ Second, even if UAF had not paid the charges secured by the carrier lien, that lien, by the plain language of § 7–307(3), terminated upon Explorer's voluntary delivery of the petition-date fuel. *Darby v. Baltimore & Ohio R. Co.*, 259 Md. 493, 498, 270 A.2d 652, 655 (1970) (quoting 1 Hawkland, *A Transactional Guide to The Uniform Commercial Code* § 1.690103 at 328 (1964), for the proposition that "[t]he validity of the carrier's specific lien is dependent on continuous possession" so that "[if] the carrier voluntarily gives up possession of the goods, the lien is lost").

■ Moreover, in the same way that Explorer's carrier lien in the petition-date fuel was limited, the carrier lien on the UAF fuel that Explorer currently possesses applies only to the storage and transportation costs associated with that fuel. As to these charges there is no need for any order of adequate protection: UAF has acknowledged its obligation to pay for delivery of this fuel, and Explorer need not surrender possession of the fuel without payment or assurance of payment that it deems adequate.

*2. The general possessory lien under Okla Stat. tit 42, § 91 for services related to personal property*

■ Rather than rely on the specific carrier lien established by the Uniform Commercial Code, Explorer relies primarily on another Oklahoma statute—Title 42, Section 91—which provides a general possessory lien in favor of any person who provides services related to personal property:

> Any person who, while lawfully in possession of an article of personal property, renders any service to the owner thereof by furnishing material, labor or skill for the protection, improvement, safekeeping, towing, storage or carriage thereof, has a special lien thereon, dependent on possession, for the compensation, if any, which is due to him from the owner for such service . . .

Okla. Stat. tit. 42, § 91A.1.

At first glance, this general possessory lien would appear to have exactly the same limitations as the specific carrier's lien under the UCC: it applies only to the compensation due the lienholder for services related to "an article of personal property" in the lienholder's possession, and the lien is "dependent on possession." Thus, the lien would not apply to services provided

---

**5.** Charges for fuel delivery under the applicable tariff were between 73.9 and 112.9 cents per barrel. See Explorer Ex. 5 at 20. An average rate of 100 cents per barrel would have resulted in delivery charges slightly in excess of $272,000.

with respect to items of property that the lienholder had previously surrendered.

Explorer, however, offers a more expansive reading—that if services are rendered in connection with multiple lots of property pursuant to a single contract, the servicer may claim a lien, for *all* amounts due under the contract, upon *any* lots remaining in the servicer's possession, even though some of the lots on which services were rendered have been surrendered. Illustrative of the decisions cited by Explorer in support of this reading is *Braufman v. Hart Publication,* 234 Minn. 343, 48 N.W.2d 546 (1951).[6] Applying a Minnesota statute similar to Oklahoma's general possessory lien provision, the *Braufman* court held that the limiting language of the statute would "not [be] applied literally in cases where the property subject to the alleged lien and other property on which no lien is claimed were delivered to the lien claimant under a single contract relating to both." 234 Minn. at 346, 48 N.W.2d at 549. *Braufman* arose in the situation of a partially completed printing contract: an entire carload of paper had been delivered to the printer, an initial installment of the job was completed, and the printed paper was released without payment. Thereafter, the owner of the paper sought return of the remaining unprinted paper, but the printer refused, claiming a lien for printing costs attributable to first installment. After a review of common law decisions adopting a "single-contract" rule for purposes of a common law possessory lien, the court found that under the rules of statutory construction applicable in Minnesota, "the absence of express language in our lien statute obliges us to hold that it is a subsisting rule of law" and hence that "several articles of personal property, de-

livered under the same contract, [must] be treated as a unit under our lien statute," so that the printer had a lien on the undelivered paper for the services rendered on the paper that had been delivered. 234 Minn. at 351, 48 N.W.2d at 551.

Although no Oklahoma court appears to have addressed the question, the "single-contract" rule recognized in *Braufman* might be found by Oklahoma courts to apply to the interpretation of Oklahoma's general possessory lien statute, and—if the statute were applicable in the present case—such an interpretation could have the effect of giving Explorer a lien on fuel now in its possession for all of the services it provided under the Letter Agreement. The Letter Agreement, after all, is a "single contract" obligating UAF to ship a minimum volume of aviation fuel through Explorer's pipeline for a two-year period, and both the UAF fuel now in Explorer's possession and each of the prepetition shipments of fuel for which UAF did not pay Explorer were shipped pursuant to this contract.

■ However, it is unnecessary to determine whether the courts of Oklahoma would apply the "single-contract" rule to Oklahoma's general possessory lien statute, because, to the extent that this statute were so interpreted, it would conflict with the specific carrier lien provisions of the Uniform Commercial Code, discussed above, and so would be inapplicable. The Oklahoma Supreme Court has repeatedly applied a "long-standing rule of construction in this jurisdiction" mandating that "where there are two statutory provisions, one of which is special and clearly includes the matter in controversy, and prescribes something different from the general statute, the special statute, and not the gener-

6. The issue is also thoroughly discussed in *In re Ash Handkerchief Corp.,* 191 B.R. 588, 591– 93 (Bankr.S.D.N.Y.1996).

al statute, applies." *City of Tulsa v. Smittle,* 702 P.2d 367, 371 (Okla.1985); *Oxley v. City of Tulsa,* 794 P.2d 742, 751 (Okla. 1989); *Carter v. City of Oklahoma City,* 862 P.2d 77, 80 (Okla.1993). Here, the carrier lien of UCC § 7–307 clearly includes the matter in controversy—the extent of a lien claimed by a carrier in goods covered by a bill of lading—and it limits the lien to charges for services provided in connection with the property covered by the bill of lading. If the general possessory lien statute is interpreted according to the "single contract" rule, it would provide something quite different: that the possessory lien on goods covered by a bill of lading extends not only to charges for services provided in connection with the goods covered by the bill of lading, but also to outstanding charges for services provided by the carrier in connection with other property of the shipper, as long as all shipments were made under the same overall contract. In the case of such a conflict, the Oklahoma rule of construction directs that the specific statute is applicable.[7]

Accordingly, the general possessory lien provisions of Okla. Stat. tit. 42, § 91 do not add to the carrier lien rights accorded to Explorer under § 7–307 of the UCC, which, as discussed above, do not require an order awarding adequate protection.

*3. The contractual lien established by Explorer's FERC tariffs.*

■ The final basis Explorer asserts for its lien claims is a provision in the FERC-approved tariffs incorporated into its contract with UAF.[8] As noted above in the Findings of Fact, these tariffs state that "the Carrier [Explorer] shall have a lien on all petroleum products accepted for transportation to secure the payment of all charges." Explorer Ex. 5 at 9.

This language does not clearly define the extent of the lien it grants. "All charges" could mean "all outstanding charges owed by the shipper to the carrier, regardless of how the charges arose," as Explorer contends. However, "all charges" could also mean "all charges incurred in connection with the particular petroleum products accepted for shipment."

The latter, limited interpretation is the more appropriate, for several reasons. First, it accords with ordinary commercial understanding, as reflected in the Uniform Commercial Code. *See Lissner,* 98 B.R. at 818 n. 2 (observing, as noted above, that "carriers do not generally claim a lien for charges in relation to other goods" than those being shipped). Second, it is supported by context. The sentence immediately preceding the grant of lien states: "The Shipper shall be responsible for payment of transportation and *all other charges applicable to the shipment,* and, if required, shall prepay *such charges* or furnish guaranty of payment satisfactory to the Carrier." Explorer Ex. 5 at 9 (emphasis added). Thus, "all charges" in the sentence granting a lien would most rea-

---

7. This result also avoids what would otherwise be a difficult problem of notice for third parties dealing in goods covered by bills of lading. Under § 7–307, the possessory lien of the carrier is limited to the costs of transporting and storing the goods covered by a bill of lading; under the "single-contract" interpretation of the general possessory lien statute, the carrier's possessory lien could have an unlimited extent.

8. The parties agree that the FERC tariffs are simply part of their contractual relationship, as opposed to administrative regulations with independent legal effect. *See Aero Trucking, Inc. v. Regal Tube Co.,* 594 F.2d 619, 621 (7th Cir.1979) (noting, in the similar context of regulation of trucking rates, that "it has long been held that properly published tariffs are incorporated into any agreement between the shipper and carrier").

sonably be understood to be a shortened expression for "payment of transportation and all other charges" applicable to the petroleum products involved in particular shipment on which the lien is granted.[9] Third, the limited interpretation follows the rule that ambiguity in a contract should be construed against the party that drafted the contract. *King–Stevenson Gas and Oil Co. v. Texam Oil Corp.,* 466 P.2d 950, 954 (Okla.1970). Explorer drafted the tariffs approved by FERC, and there is no indication that FERC changed the lien language that Explorer suggested.

With its ambiguity resolved in favor of a limitation to the charges for the particular products being shipped, the contractual lien imposed by Explorer's tariffs is also coextensive with the carrier lien created by § 7–307 of the UCC and does not require an award of adequate protection.

■■■ With respect to this contractual lien, however, there is an additional factor, unique to bankruptcy, bearing on Explorer's claim. Like the carrier lien of the UCC, the contractual lien of the tariffs applied to the petition-date fuel in Explorer's possession. However, unlike statutory liens, liens created by contract do not ordinarily apply to property that is acquired by a debtor after the filing of a bankruptcy case. Section 552(a) of the Bankruptcy Code provides generally that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Section 552(b) sets out exceptions to this rule—one for lodging receipts and another for a security interest that extends both to prepetition property of the debtor "and to proceeds, product, offspring, or profits of such property." These exceptions have no application here. The aviation fuel acquired by UAF after the bankruptcy filings is in no sense a "proceed, product, offspring, or profit" of the fuel it provided to Explorer prior to the filing. Thus, as Explorer's counsel conceded at trial (Tr. 122–23), Explorer has no contractual lien on the UAF fuel presently in its possession, since all of this fuel would have been acquired by UAF postpetition.

*4. Cash collateral.*

■■■ Much of Explorer's motion for adequate protection is premised on the assertion that UAF sold fuel that Explorer had delivered, and that Explorer has a security interest in the proceeds of the sales, rendering the proceeds "cash collateral" subject to the special protections of § 363(a) and (c)(2). However, Explorer introduced no evidence that UAF sold any of the delivered fuel. More importantly, Explorer made no showing that any of the liens it asserts extended to the proceeds of the fuel it delivered on UAF's account. To the contrary, both of the statutory liens on which Explorer relies are expressly possessory, terminating when Explorer delivered the collateral in question, and so

---

**9.** The decision that Explorer relies on most heavily in support of its tariff-based lien argument, *Arco Pipe Line Co. v. Basin Refining, Inc. (In re Basin Refining, Inc.),* Adversary No. 381–0646, Bankruptcy No. 381–00792–F (Bankr.N.D.Tex. July 30, 1982), held that tariff-created lien did extend to amounts owing under crude oil shipments that had been completed at the time the lien was asserted. However, the grant of the lien in the *Basin Refining* tariff was substantially different from the one here. It read (slip op. at 9–10): "All crude petroleum which is received from a Shipper or is destined to a Consignee who has failed to pay Carrier for gathering, transportation, or demurrage charges shall be subject to the imposition of a lien by Carrier to obtain payment of such charges." This difference in the language granting the lien deprives the *Basin Refining* decision of any value in interpreting the lien in Explorer's tariffs.

could not apply to proceeds UAF obtained after it received the collateral from Explorer. The tariff lien makes no mention at all of proceeds. Thus, Explorer's lien rights did not extend beyond the aviation fuel it transported on behalf of UAF. It never had an interest in cash collateral.

### 5. *Misrepresentation.*

■■■ As noted earlier, Explorer has asserted that it delivered petition-date fuel to UAL in reliance on promises that UAF would pay the full amount of Explorer's claim for fuel delivered prepetition. If Explorer had actually been harmed by a tortious misrepresentation of the debtors during the course of this bankruptcy case, it could make a claim against the debtors for payment of a priority administrative expense based on the misrepresentation. *See Reading Co. v. Brown,* 391 U.S. 471, 485, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (torts committed during the operation of a debtor's business in bankruptcy may be accorded administrative claim status); *Yorke v. N.L.R.B.,* 709 F.2d 1138, 1143 (7th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984) (failure to engage in good faith collective bargaining gives rise to an administrative expense).

However, the rulings set out above indicate that Explorer would not have been damaged by any of the representations it attributes to the debtors. The only lien that Explorer ever had was for the delivery charges attributable to the fuel in its possession. At any time, Explorer could have insisted on satisfaction of that lien before releasing the fuel it had transported. Before the bankruptcy filing, when Explorer released fuel without payment, it lost its lien on that fuel. Thus, Explorer was always an unsecured creditor with respect to its prepetition delivery charges.

No representation of the debtors caused any change in this position.

Explorer is now being paid for all of its fuel deliveries after the bankruptcy filing, and it has a general unsecured claim for its prepetition deliveries. It is not entitled to more.

### Conclusion

For the reasons set out above, Explorer's motion for adequate protection is denied. A separate order will be entered to that effect.